**VALERO ENERGY CORP.,**
**et al., Appellants,**

v.

**TECO PIPELINE CO., Appellee.**

No. 14–96–01234–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 26, 1999.

Rehearing Overruled Oct. 7, 1999.

J. Clifford Gunter, III, Gayle A. Boone, Martin Edward Loeber, Gael Plauche, Andrew M. Edison, Houston, for appellants.

Craig B. Glidden, Timothy J. Hill, Donald B. McFall, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices ANDERSON and EDELMAN.

## OPINION

JOHN S. ANDERSON, Justice.

This is an interlocutory appeal of an order denying a motion to stay proceedings and compel arbitration. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a) (Vernon Supp.1999).[1] Teco Pipeline Company has sued Valero Energy Corp., 24 related companies, and two officers and directors, Stan L. McLelland and William L. Greehey (collectively "Valero").[2] Valero filed a motion to stay proceedings and compel arbitration. In response, Teco filed a motion to stay arbitration. The trial court granted Teco's motion, while denying Valero's motion. In two points of error, Valero asserts the trial court erred in denying its motion to stay proceedings and compel arbitration and granting Teco's motion to stay arbitration. We reverse and remand.

### Background

From 1969 to 1985, Valero was the sole operator and owner of the TransTexas Pipeline System, which delivered gas from Waha, Texas to New Braunfels, Texas. Through a merger with a network of pipelines, the TransTexas Pipeline was also able to deliver gas to the Texas Gulf Coast. InterNorth, Inc. owned an interstate pipeline connecting West Texas to northern states.

On November 6, 1984, Valero and Northern Natural Gas Company, a division of InterNorth, signed a letter of intent to form a joint venture for the purpose of purchasing, transporting, and marketing natural gas. This agreement was formal-

---

1. The provision for interlocutory appeal of an order granting or denying arbitration was formerly found in § 171.017 of the Texas Civil Practice & Remedies Code. Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3408, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 5.01, 1997 Tex. Gen. Laws 336.

2. The other Valero companies are Valero Management Company, VGMA Company, VNGC Holding Company, Valero Natural Gas Company, Valero Eastex Pipeline Company, Valero Transmission Company, Valero Gas Marketing Company, Valero Gas Storage Company, Valero Industrial Gas Company, Valero Hydrocarbons Company, VT Company, Valero Marketing Company, Valero Natural Gas Partners, L.P., Valero Management Partnership, L.P., Valero Transmission, L.P., Valero Hydrocarbons, L.P., Valero Marketing L.P., Valero Industrial Gas, L.P., Valero Gas Marketing, L.P., VLDC, L.P., Reata Industrial Gas, L.P., Valero Nortex, L.P., Valero Northern Texas Company, and West Texas Transmission Company.

ized on February 1, 1985, when Valero and Northern Intrastate Pipeline Company entered into a partnership agreement, forming the Nor–Val Gas Company ("Nor–Val"). On February 28, 1985, Valero entered into a Purchase Agreement with InterNorth and Northern Texas Intrastate Pipeline Company ("NorTex"), a wholly owned subsidiary of InterNorth, for the purpose of transporting natural gas via the TranTexas Pipeline. Under the Purchase Agreement, Valero sold a one-half undivided interest in the TransTexas Pipeline to NorTex and 125,000 shares of Valero stock to InterNorth.

As exhibits to the Purchase Agreement, Valero entered into three additional agreements with InterNorth and NorTex. The first agreement was the Operating Agreement, which created a joint venture for the purpose of providing for the operation, management, and maintenance of the TransTexas Pipeline. Valero Transmission Company ("VTC") was appointed operator. The second agreement was the Ownership Agreement, which set forth a mutual understanding between the parties with regard to the rights of each party in the joint ownership of the TransTexas Pipeline. The third agreement was the Transportation Agreement, which allowed InterNorth to transport gas from New Braunfels to Houston on other portions of Valero's integrated pipeline system.

Two months later, InterNorth merged with Houston Natural Gas ("HNG") to form Enron, Inc. At that time, HNG was a primary Valero competitor, owning a 50% interest in the only other pipeline delivering gas from West Texas to the Texas Gulf Coast. Seeking to block the merger, Valero filed suit against InterNorth and NorTex in the United States District Court for the Western District of Texas, San Antonio Division. Valero asserted that the merger violated NorTex's fiduciary duties under the Ownership Agreement.

On May 28, 1985, the parties entered into a Settlement Agreement ("1985 Settlement Agreement"). Under the 1985

Settlement Agreement: (1) Nor–Val was to be dissolved, (2) NorTex agreed to sell its one-half interest to an acceptable purchaser, (3) Valero retained the right to disapprove of any pipeline purchaser tendered by NorTex, and (4) Valero reaffirmed its right of first refusal to repurchase the pipeline as set forth in the Ownership Agreement.

In addition to filing suit in federal court, Valero also had lodged a complaint with the Federal Trade Commission ("FTC") regarding the proposed InterNorth/HNG merger. The FTC, finding antitrust implications, drew up a Consent Decree, which provided that in order for the merger to proceed, InterNorth had to divest itself of its interest in the TransTexas Pipeline.

In 1987, in an effort to reorganize and refinance its internal operations, Valero assigned its interest in the TransTexas Pipeline to a related entity. Enron threatened to block the assignment by exercising its right of first refusal under the Ownership Agreement. On March 24, 1987, the parties executed the TransTexas Settlement Agreement, which eliminated Valero's veto rights over any pipeline purchaser tendered by NorTex, but allowed Valero to continue with its reorganization.

On July 15 1987, Enron and Teco entered into an agreement for the sale of NorTex, which included its interest in the TransTexas Pipeline. Valero opposed the sale to Teco and, exercising its right of first refusal, proposed to purchase the NorTex stock, thereby obtaining complete ownership of the pipeline. Enron submitted both proposed sales to the FTC for approval. The FTC approved the sale to Teco and disapproved the sale to Valero.

Believing that the FTC did not have the authority to disapprove of the sale to Valero in view of its right of first refusal, Valero sued Enron, NorTex, and Teco in state court, for breach of contract. Valero also sought and received a temporary injunction blocking the conveyance of the pipeline to Teco. The case was removed to

the United States District Court. After a trial on the merits, judgment was entered in favor of Enron, NorTex, and Teco and the temporary injunction was dissolved. The United States Fifth Circuit Court of Appeals affirmed the judgment. *See West Tex. Transmission, L.P. v. Enron Corp.,* 907 F.2d 1554 (5 th Cir.1990). On December 12, 1988, Enron closed on the sale to Teco. Purchasing NorTex's interest in the pipeline, Teco became a successor in interest to NorTex's partnership rights and succeeded to all of the contractual agreements between NorTex and Valero.

On April 24, 1996, Teco filed the underlying suit, asserting causes of action for breach of fiduciary duty, fraud, tortious interference, and professional malpractice. Valero counterclaimed for breach of contract of the Operating Agreement, breach of fiduciary duty, and fraud. Asserting that Teco's claims are based on the Operating Agreement, Valero moved to stay the litigation and compel arbitration pursuant to the Texas General Arbitration Act ("TGAA"), Chapter 171 of the Texas Civil Practice & Remedies Code, and the arbitration clause found in the Operating Agreement:

> 3.01 *General.* Any dispute arising with respect to any matter within the scope of the Operating Agreement shall be resolved by arbitration pursuant to this Article C, which is intended to provide the exclusive means for resolving all such disputes....

Teco moved to stay arbitration on several grounds: (1) the TGAA applies only to disputes between nonprofit entities, (2) its claims arise out of a partnership separate and independent of the joint venture established in the Operating Agreement, (3) the arbitration clause has been revoked, (4) the Operating Agreement specifically excludes from arbitration claims regarding the transporting of third party natural gas, (5) the scope of the arbitration clause is too narrow to include its claims, (6) the Valero defendants, who are not signatories to the Operating Agreement, may not en-

force the arbitration clause, (7) Valero has waived its right to enforce the arbitration clause by its previous litigation, and (8) Valero has failed to satisfy any conditions precedent to arbitration. After a hearing, the trial court denied Valero's motion to stay litigation and compel arbitration and granted Teco's motion to stay arbitration.

### Standard of Review

■■■ In determining whether to compel arbitration, the court must decide two issues: (1) whether a valid, enforceable arbitration agreement exists, and (2) if so, whether the claims asserted fall within the scope of the agreement. *See Dallas Cardiology Assocs., P.A. v. Mallick,* 978 S.W.2d 209, 212 (Tex.App.-Texarkana 1998, pet. denied); *Nationwide of Bryan, Inc. v. Dyer,* 969 S.W.2d 518, 520 (Tex. App.-Austin 1998, no pet.). The court has no discretion but to compel arbitration if the answer to both questions is affirmative. *See Dallas Cardiology Assocs., P.A.,* 978 S.W.2d at 212; *Merrill Lynch, Pierce, Fenner & Smith v. Eddings,* 838 S.W.2d 874, 878 (Tex.App.-Waco 1992, writ denied).

■■■ Whether the parties have agreed to arbitrate is a question of fact to be summarily determined by the trial court. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.021(b) (Vernon Supp.1999); *see also Weber v. Hall,* 929 S.W.2d 138, 141 (Tex. App.-Houston [14 th Dist.] 1996, orig. proceeding). Appellate courts use a "no evidence" standard for review of factual questions. *See Fridl v. Cook,* 908 S.W.2d 507, 511 (Tex.App.-El Paso 1995, writ dism'd w.o.j.). In a no evidence point, we consider only the evidence that supports the finding, while disregarding the evidence to the contrary. See *Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.,* 849 S.W.2d 380, 384 (Tex.App.-Houston [14 th Dist.] 1993, writ denied). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *See id.*

Legal conclusions, on the other hand, are subject to *de novo* review. *See Fridl,* 908 S.W.2d at 511; *see also Certain Underwriters at Lloyd's of London v. Celebrity, Inc.,* 950 S.W.2d 375, 377 (Tex. App.-Tyler 1996), *writ dism'd w.o.j.,* 988 S.W.2d 731 (Tex.1998) (per curiam). *De novo* review is appropriate when the legal interpretation of the arbitration clause, and no fact issue, is before the court. *See Nationwide of Bryan, Inc.,* 969 S.W.2d at 520; *Certain Underwriters at Lloyd's of London,* 950 S.W.2d at 377; *Texas Private Employment Ass'n v. Lyn–Jay Int'l, Inc.,* 888 S.W.2d 529, 531 (Tex.App.-Houston [1st Dist.] 1994, no writ).

## Scope of the TGAA

As a preliminary matter, Teco argues the TGAA applies only to nonprofit entities. Until 1995, when it was codified and moved to Chapter 171 of the Texas Civil Practice and Remedies Code, the TGAA was found in articles 224 through 238–20 of the Texas Revised Civil Statutes. *See* Act of June 18, 1965, 59th Leg., R.S., ch. 689, § 1, 1965 Tex. Gen. Laws 1593–1601, *redesignated and amended by* Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3402–09. Teco contends that when the Texas Legislature amended the TGAA in 1995, it limited the entire Act to disputes between nonprofit entities. In support of this argument, Teco cites section 171.022 of the Texas Civil Practice & Remedies Code, which states:

> The provisions of this chapter apply only to the arbitration of controversies between members of associations or corporations which are exempt from the payment of federal income taxes pursuant to Section 501(c) of the U.S. Internal Revenue Code or which are incorporated pursuant to the Texas Non–Profit Corporation Act (Article 1396–1.01 et seq., Vernon's Texas Civil Statutes).

TEX. CIV. PRAC. & REM.CODE ANN. § 171.022.

Reading § 171.022 out of context from the preceding sections appears to support the argument that the TGAA is limited to disputes involving members of nonprofit entities. *See D. Wilson Constr. Co. v. Cris Equip. Co.,* 988 S.W.2d 388, 394 (Tex. App.-Corpus Christi 1999, no pet. h.); *Holk v. Biard,* 920 S.W.2d 803, 807 (Tex. App.-Texarkana 1996, orig. proceeding [leave denied] ). Prior to its codification in 1995, § 171.022 was found in § 3 of article 238–20 of the Texas Revised Civil Statutes. Article 238–20 had four sections, which expressly applied to specific enforcement of executory agreements to arbitrate future disputes. *See Holk,* 920 S.W.2d at 807–08. When the TGAA was redesignated as Chapter 171 of the Texas Civil Practice and Remedies Code, former § 3 of article 238–20 was carried forward into Chapter 171. *See id.* at 808. Through error, however, § 3 was separated from the remaining three sections of former article 238–20, which were moved to § 171.021. *See id.* Rather than being designated as subsection (d) of § 171.021, § 3 was placed alone as § 171.022. *See id.* This made § 171.022 appear to limit the entire act, rather than applying only to specific performance of executory arbitration agreements in the bylaws of nonprofit corporations. *See id.; see also D. Wilson Constr. Co.,* 988 S.W.2d at 394.

The *Holk* court's reasoning is further strengthened by the fact that since Teco filed the underlying suit in 1996, the Texas Legislature has corrected the error by renumbering the TGAA. Section 171.022 is now designated § 173.002 of the Texas Civil Practice & Remedies Code. *See* Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3409, *added by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 5.03, 1997 Tex. Gen. Laws 349. Chapter 173 of the Texas Civil Practice & Remedies Code specifically and expressly applies to controversies between certain nonprofit entities. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 173.001–173.003 (Vernon Supp.1999). Accordingly, we hold the TGAA, Chapter 171 of the Civil Practice &

Remedies Code, is not limited to disputes between nonprofit entities.

## Conditions Precedent

 Teco asserts Valero has failed to comply with contractual conditions precedent to enforce the agreement to arbitrate.[3] Valero, on the other hand, maintains that whether it has satisfied any condition precedent is a question for the arbitrator, not the court. In support of this contention, Valero cites several federal cases construing the Federal Arbitration Act. *See, e.g., Del E. Webb Constr. v. Richardson Hosp. Auth.,* 823 F.2d 145, 149 (5 th Cir.1987); *Smith Barney Shearson, Inc. v. Boone,* 838 F.Supp. 1156, 1158 (N.D.Tex. 1993), *aff'd,* 47 F.3d 750 (5 th Cir.1995). We note that in construing the TGAA, there is a conflict among Texas courts of appeals on this issue. *See, e.g., D. Wilson Constr. Co.,* 988 S.W.2d at 395 (holding the trial court may determine issue of condition precedent to enforcement of agreement to arbitrate); *City of Lubbock v. Hancock,* 940 S.W.2d 123, 127 (Tex.App.-Amarillo 1996, orig. proceeding) (holding that under the TGAA, procedural questions, such as compliance with conditions precedent, are left to arbitrator's determination).

Addressing the question of whether a collective bargaining agreement with an arbitration provision required an employer, who did not sign the agreement, to arbitrate, the United States Supreme Court stated, "Once it is determined … that the parties are obligated to submit to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). In reaching this conclusion, the Court distinguished substantive arbitrability, i.e., whether the dispute is encompassed by an agreement to arbitrate, and procedural arbitrability, i.e., issues such as compliance with a condition precedent to arbitrate. *See City of Lubbock,* 940 S.W.2d at 126 (citing *John Wiley & Sons, Inc.,* 376 U.S. at 556–58, 84 S.Ct. 909). This reasoning has been followed in construing the Federal Arbitration Act. *See Smith Barney Shearson, Inc.,* 838 F.Supp. at 1158.[4] The Amarillo Court of Appeals found the TGAA, like the Federal act, distinguishes substantive from procedural arbitrability. *See City of Lubbock,* 940 S.W.2d at 127.[5] Therefore, because

---

**3.** The arbitration clause in the Operating Agreement contains a condition precedent, which provides:

> … Any Party (or the Operator) wishing to submit a dispute or other matter for arbitration hereunder shall first, by notice to the other Party and the Operator, call a meeting of the Management Committee to consider such dispute or other matter, such meeting to be held when, where and as reasonably specified in said notice, but not less than ten days nor more than twenty-five days after such notice is received. If such meeting is called and held as herein provided and the dispute or other matter submitted for consideration at such meeting is not resolved to the satisfaction of both Parties, … then either Party may within ten days thereafter submit the matter to arbitration in accordance with the following Sections 3.02 through 3.09.

**4.** Section 4 of the Federal Arbitration Act provides, in part:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.
>
> 9 U.S.C.A. § 4 (1999).

**5.** Section 171.002(a) of the Texas Civil Practice & Remedies Code, as cited in *City of Lubbock,* states:

> On application of a party showing an agreement described in Section 171.001, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration; but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party; otherwise, the application shall be denied.

Act of June 14, 1995, 74 th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3403, *amended by*

the TGAA does not require or authorize the trial court to address questions of procedural arbitrability, the trial court need only decide two issues: (1) whether there is an agreement to arbitrate, and (2) whether the dispute comes within the scope of the arbitration agreement. *See id.*

Similarly, this court has previously decided procedural issues are for the arbitrator's determination. *See Kline v. O'Quinn,* 874 S.W.2d 776, 782 (Tex.App.-Houston [14 th Dist.] 1994, writ denied) (holding that while the determination of the scope of an arbitration agreement is for the court, the enforcement of pleading requirements before the arbitrator is a procedural matter for the arbitrator). We conclude, therefore, that whether Valero satisfied any conditions precedent to arbitration is for the arbitrator's determination. Hence, it is not necessary for this court to make that determination.

Act of May 21, 1997, 75 th Leg., R.S., ch. 165, § 5.01, 1997 Tex. Gen. Laws 330. The current version of this provision, without any substantive changes, is found at TEX. CIV. PRAC. & REM.CODE ANN. § 171.021 (Vernon Supp. 1999).

6. Although Teco raises this argument in its rejoinder brief to this court, a review of the reporter's record of the hearing on the motion to compel arbitration reflects that Teco abandoned its contention that there was a separate partnership:

THE COURT: Well now, when you say the partnership there, let's make it clear exactly what you're talking about.

\* \* \*

MR. MCFALL [Counsel for Teco]: Talking about the TransTexas Pipeline Partnership, Your Honor.

THE COURT: Okay. So we're talking about the written partnership and not the oral or the implied partnership as has been alleged by the defendant, right? You're claiming — what I'm trying to get clear is — see, what I get out of this is there's two things. Clearly, there is a joint venture that everybody agrees is in existence.

\* \* \*

THE COURT: Then there is this other partnership theory that's out there; is that right?

## Separate Partnership

██ Teco further argues its claims are not based on the Operating Agreement, which contains an arbitration clause, but rather, arise out of a separate unwritten partnership agreement, which was created as a result of the sale of the 50% undivided interest in the pipeline. Therefore, according to Teco, because its claims are related to this separate partnership, they are not subject to the arbitration clause of the Operating Agreement.[6]

██ "A partnership is an association of two or more persons to carry on as co-owners of a business for profit." TEX.REV.CIV. STAT. ANN. art. 6132b § 6(1) (Vernon 1970). This association must be based on an express or implied agreement. *See Grimmett v. Higginbotham,* 907 S.W.2d 1, 2 (Tex.App.-Tyler 1994, writ denied). An express or implied partnership agreement has four essential elements: (1) a community of interest in the venture, (2)

MR. GLIDDEN [Counsel for Teco]: It's not really another partnership. What it is is the scope of the partnership. We say that there are duties beyond what's contained in the written agreement, they say there cannot be and as a result, they want to call what we're saying are the additional duties some separate independent partnership or some contrived independent partnership and we aren't saying that. We're saying these guys are partners. The relationship is defined in part by the agreement and in part by what they do and in part by the law. And -

\* \* \*

THE COURT: Okay. Okay. So what we're looking at right here today then, just to be clear, make it clear is whether or not these are stand alone causes of action, independent torts.

MR. GLIDDEN: That's right.

an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 176 (Tex. 1997). As a matter of law, a partnership does not exist if any one of these elements is not established. *See id.; Stephanz v. Laird,* 846 S.W.2d 895, 900 (Tex.App.-Houston [1 st Dist.] 1993, no writ); *State v. Houston Lighting & Power Co.,* 609 S.W.2d 263, 268 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.). The burden of proof is on the party seeking to establish the partnership. *See Stephanz,* 846 S.W.2d at 899; *Ben Fitzgerald Realty Co. v. Muller,* 846 S.W.2d 110, 120 (Tex.App.-Tyler 1993, writ denied).

At his deposition, Craig New, President of Teco, testified as to his beliefs concerning the existence of a relationship independent of the Operating Agreement:

Q. Okay. So now that we've said that, did you have any reason to believe that some type of partnership existed separate and apart from that when you signed this letter on July the 15 th, 1987?

A. Yes, sir, I did.

Q. What did you believe existed?

A. I believed that a partnership, a commercial partnership existed outside of these written documents.

\* \* \*

Q. Now, what did you believe the terms of the partnership were on July the 15 th, 1987?

A. I believed that it was — on July 15, '87, it was a partnership that existed between Valero and Nor-Tex. Valero was the general partner or managing general partner. They were to conduct the business affairs, commercial affairs of the partnership.

\* \* \*

A. That Valero would manage this partnership.

With respect to the division of profits and losses, New further testified:

Q. And how were the partnership profits and expenses to be split up or accounted for?

A. The — all of the revenues and all of the expenses were going to be divided, or were divided equally between the partners.

Q. Was there any agreement that provided that?

A. The — in the Operating Agreement, which was an agreement between Valero as operator and the partners, Valero and Teco, Valero was elected to be the operator and also had a long accounting procedure that was appended to that agreement that provided for accounting for revenues, costs, allocations of overhead, whatnot.

Q. So you're saying — are you saying that that procedure was what you thought was to be used for accounting for the partnership revenues and profits?

A. Yes, sir, I believe that's right.

Teco also points to several documents, which it contends establishes the existence of a separate partnership. The first document is a Valero "offering memorandum," which states, in part:

In February, 1985, Valero sold a 50% undivided interest to Northern Natural Gas Company forming the TransTexas Pipeline Partnership.

The second document is an internal Valero memorandum stating, in part:

... whether TransTexas Pipeline Company ("TPC"), a joint venture between Valero Transmission, L.P. and TECO on the West Texas pipeline, can enjoin and/or prohibit the use of "TransTexas Transmission Corporation" ("TTC") as the new name of TransAmerican Natu-

ral Gas Corporation due to similarity of name and possible customer confusion.

The third document is the minutes of a meeting of the Management Committee stating:

> *Need to structure TransTexas as Partnership* — As a result of previous conversations between Teco and Valero concerning the TransTexas Extension Project, there was some thought given to drafting a partnership agreement between Teco and Valero to formalize the actions taken jointly as TransTexas Pipeline in the past. After some discussion, the Management Committee took the posture of "if it isn't broke, don't fix it" and tabled the issue pending any future input Teco may have on the matter.

While concluding that a partnership existed, New did not testify as to any facts to support his conclusion. Without more, New's belief that there was a separate partnership relationship between Valero and Teco is not probative evidence of a separate partnership. *See Ben Fitzgerald Realty Co.*, 846 S.W.2d at 1211 (finding mere legal conclusions by a lay witness do not prove existence of a partnership) (citing *Murphy v. McDermott, Inc.*, 807 S.W.2d 606, 613 (Tex.App.-Houston [14 th Dist.] 1991, writ denied)). Moreover, Teco has failed to present any evidence of an agreement to share either profits or losses. New's belief that the partners would divide revenues and expenses in accordance with accounting procedures set forth in the Operating Agreement is not sufficient to establish an agreement to share profits or losses necessary to prove the existence of the separate partnership. If anything, this suggests the relationship is based on the Operating Agreement. Without an agreement providing for the sharing of profits and losses, there can be no partnership. *See, e.g., Schlumberger Tech. Corp.*, 959 S.W.2d at 176; *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 288 (Tex.1978); *Ben Fitzgerald Realty Co.*, 846

S.W.2d at 121; *Houston Lighting & Power Co.*, 609 S.W.2d at 268.

With respect to the documents evidencing a separate partnership, we reach the same conclusion, i.e., without an agreement to share profits and losses there is no partnership agreement. *See Grimmett*, 907 S.W.2d at 2–3 (finding that although there were numerous documents reflecting the existence of a partnership, in addition to witness testimony of party representations of a partnership, there was no partnership in the absence of an agreement to share losses). A representation contained in a document or made to a third party that a partnership relationship exists constitutes a legal conclusion and is not determinative of the relationship. *See id.* at 2 n. 3 (citing *Coastal Plains Dev. Corp.*, 572 S.W.2d at 288) (stating "[j]ust as the words used by the parties in a contract do not necessarily control the substance of the relationship, the terms used by the parties in referring to the arrangement do not control"); *see also Murphy*, 807 S.W.2d at 613 (finding summary judgment proof that one party referred to another as a partner was a legal conclusion, which cannot give rise to an issue of disputed fact of the existence of a partnership). Accordingly, we find no evidence of any partnership separate from the joint venture established under the terms of the Operating Agreement.

### Agreement to Arbitrate

Teco contends that even if its claims are based on the Operating Agreement, there is no agreement to arbitrate because the arbitration clause was revoked by the 1985 Settlement Agreement. Without an agreement to arbitrate, arbitration cannot be compelled. *See Freis v. Canales*, 877 S.W.2d 283, 284 (Tex.1994) (original proceeding) (per curiam). Teco asserts the May 1985 Settlement Agreement redefined the parties relationship and governed all aspects of the relationship in place of the four agreements, including the Operating Agreement, signed

in February 1985. The May 1985 Settlement Agreement provides:

14.3 *Governing Law and Jurisdiction.*

(b) Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.

Teco asserts the above clause provides for the procedure to be used in future disputes, i.e., that the parties will go through judicial channels, not arbitration. Teco also asserts the intent to revoke the arbitration clause is signified by the merger clause contained in the Settlement Agreement.[7]

We disagree with Teco's contention. A review of the 1985 Settlement Agreement reflects that it did not revoke any clause to arbitrate. First, this clause refers to "this Agreement." The first page of the 1985 Settlement Agreement shortens its title to the "Agreement." Therefore, this provision applies to disputes arising out of the 1985 Settlement Agreement, not the previously executed Purchase, Operating, Ownership, and Transportation Agreements.

Second, while the Settlement Agreement may have modified some select terms of the Purchase, Operating, Ownership, and Transportation Agreements, those modifications are expressly set forth. Section 14.10 of the Settlement Agreement specifically amends the Operating Agreement:

14.10 *Operating Agreement Amendment.* Simultaneously with the execution of this Agreement, Transmission and NorTex have executed Amendment No. 1 to Pipeline Operating Agreement in the form attached hereto as Schedule D.

Amendment No. 1, as referenced above, relates to the direction of gas flow.

Third, there is nothing to indicate that *all* the terms of those previous agreements have been superceded by the Settlement Agreement. If this were the case, then nearly all material aspects of the relationship between the parties would be left undetermined.

On June 12, 1985, Valero Transmission Company and InterNorth entered into an agreement regarding the distribution of NorTex's share of net revenues from its joint ownership of the TransTexas Pipeline. This agreement further provided:

Should InterNorth, Inc. desire to audit the amount of such payment, then, notwithstanding the sale of NorTex to a third party, VTC will permit InterNorth, Inc. to audit such payment amount in accordance with the provisions of the Operating Agreement. *Should a dispute arise as to such payment amount, such dispute shall be submitted to arbitration as set forth in the Operating Agreement.*

**7.** 14.6 *Entire Agreement; Amendments and Waivers.* This Agreement, together with all exhibits and schedules attached hereto, constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and supercedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representation or other agreements between the Parties in connection with the subject matter hereof except

as set forth specifically herein or contemplated hereby. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

[emphasis added]. Article V of the Operating Agreement establishes how the revenues are to be shared between the joint venturers. A review of the Operating Agreement reveals no limitation on submitting any dispute under Article V to arbitration. The June 12, 1985 letter, which was entered into after the Settlement Agreement, indicates that the arbitration clause is still in full force and effect.

Teco, however, argues that a letter dated February 10, 1986, between Valero and InterNorth confirms the revocation of the arbitration clause. In referencing Amendment No. 1 to the Purchase Agreement and Amendment No. 2 to the Operating Agreement, both dated January 1, 1986, the letter states, in relevant part:

> Execution of the attached Amendments by InterNorth and NorTex is not, and shall in no way be deemed or construed to be, a waiver of InterNorth's or NorTex's right or rights to pursue any remedies now or in the future, at law or in equity, with regard to any matter arising out of or in connection with the Purchase Agreement, dated February 28, 1985 or the Operating Agreement, dated February 28, 1985.

Teco claims that NorTex was not waiving its right to pursue any remedies available to it with regard to matters arising from the Purchase and Operating Agreements and that all matters arising out of or connected with the Operating Agreement were not subject to forced arbitration. Valero responds by pointing out the letter agreement merely states the execution of the referenced amendments would not be interpreted as a waiver of any rights arising under the Operating Agreement, which includes compelling arbitration. Therefore, according to Valero, the letter agreement confirms that the right to compel arbitration under the Operating Agreement is still available.

On October 1, 1991, Valero and Teco amended several provisions of the Operating Agreement. One such modification concerned § 3.03, which pertains to how the Management Committee is to conduct its meetings. A comparison of the original Operating Agreement and the 1991 Amendment reveals a minor modification, otherwise leaving the entire section, including the reference to arbitration, intact. It states, in part: "[m]atters which cannot be resolved by the Management Committee as set forth above shall be resolved by arbitration as provided in Exhibit B, Article C." The amendment reaffirms that the arbitration clause found in Exhibit B, Article C of the Operating Agreement, which is at issue here, is still in effect.

■■■ Valero argues that even if the arbitration clause had been previously revoked, it was revived by its incorporation in the 1991 Amendment. Teco responds that any revival of the arbitration agreement was the result of fraudulent inducement or a mutual mistake. To establish fraud in the inducement in the formation of arbitration agreement, Teco must prove (1) a material representation was made, and (2) it was false. *See In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 574 (Tex.1999) (per curiam). Teco argues that had Valero fulfilled its duty to inform it that the 1991 Amendment would revive the arbitration clause, Teco would not have signed the amendment. Teco has not cited to any evidence in the record in support of this assertion.

■■■ Teco also refers to the mention of "arbitration as provided in Exhibit B, Article C" as a "casual reference at the bottom of a long paragraph." Teco contends the inclusion of this reference is a mutual mistake because the parties never intended to revive the arbitration clause. "The law presumes that a written agreement correctly embodies the parties' intentions, and is an accurate expression of the agreement the parties reached in prior oral negotiations." *Estes v. Republic Nat'l Bank of Dallas,* 462 S.W.2d 273, 275 (Tex. 1970). A mutual mistake occurs when both parties to a transaction have a belief

in the present existence of a thing, material to the transaction, that does not exist. *See United Interests, Inc. v. Brewington, Inc.,* 729 S.W.2d 897, 903 (Tex.App.-Houston [14 th Dist.] 1987, writ ref'd n.r.e.). An example is when the parties to the contract have a common intention, but the written contract erroneously reflects that intention because of a mistake by both parties in writing the agreement. *See id.* Teco, as the party claiming relief, must show what the parties's true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake. *See Estes,* 462 S.W.2d at 275. Parol evidence is admissible to show mutual mistake. *See id.* Teco has failed to present any evidence to satisfy its burden of establishing mutual mistake. Finding there is no evidence that the arbitration agreement was revoked or that it was later revived as a result of fraudulent inducement or a mutual mistake, we conclude the arbitration clause remains in full force and effect.

### Scope of the Operating Agreement

 Teco further claims the Operating Agreement excludes the subject matter of its claims. Teco states § 2.11(D) of the Operating Agreement is the only provision covering third-party transportation transactions, which are at issue in the underlying litigation. According to Teco, § 2.11(D) specifically precludes arbitration of its claims:

2.11 *Transportation Fee.*

\* \* \*

(D) All Other Volumes. For all volumes of gas transported through the System other than those volumes set forth and described in Section 2.11(A) and (B), the Joint Venture shall charge such transportation fee as the Management Committee shall, within applicable regulatory constraints, determine to be appropriate. Notwithstanding any other provisions of this Operating Agreement, the failure of the Management Committee to agree upon a transportation fee for any proposed transportation service involving volumes described in this Section 2.11(d) shall be deemed to be a final decision not to perform such particular service and any dispute with regard to such decision shall not be submitted to arbitration. . . .

Valero asserts this clause provides only that it is the Management Committee's responsibility to set the transportation fee. If a party does not approve of the transportation fee or wants a reduction or an increase in a fee, then it must go to the Management Committee and request a change in the transportation fee. If the Management Committee cannot agree upon the transportation fee, neither party can force the decision to arbitration. Therefore, Valero contends it does not provide an exception to arbitration for all disputes over third party contracts.

We agree. Teco's claims revolve around Valero's alleged diversion of business opportunities, the rerouting of gas to other pipelines owned by Valero, discounting services to customers in exchange for benefits to Valero, and usurping opportunities for pipeline interconnects and facilities. Teco's claims do not involve the Management Committee's failure to agree on a certain transportation fee. Therefore, we find Teco's claims are not excluded from arbitration by the express terms of the Operating Agreement.

### Intertwining of Claims

 Teco also asserts that even if there is a valid arbitration agreement between the parties, its claims still do not come within the purview of the agreement. Once the existence of an arbitration agreement is shown, the party seeking to avoid the effects of the arbitration agreement may do so by establishing that the dispute is not within the terms of the agreement. *See D. Wilson Constr. Co.,* 988 S.W.2d at 394. Whether the parties' agreement imposes a duty to arbitrate is a matter of

**590**

contract interpretation and a question of law for the court. *See Kline,* 874 S.W.2d at 782. Therefore, the language of the contract will be enforced according to its plain meaning unless such a reading would defeat the intentions of the parties. *See D. Wilson Constr. Co.,* 988 S.W.2d at 394. Because this issue involves the trial court's interpretation of the arbitration clause, *de novo* review is appropriate. *See Nationwide,* 969 S.W.2d at 520; *Certain Underwriters,* 950 S.W.2d at 377.

■ In determining whether a tort claim falls within the scope of an agreement to arbitrate, the focus should be on the factual allegations contained in the petition rather than on the legal causes asserted. *See Valero Energy Corp. v. Wagner & Brown, II,* 777 S.W.2d 564, 566 (Tex.App.-El Paso 1989, writ denied).

> The test should be based on a determination of whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract.

*Id.* Arbitration is favored by Texas courts. *See Fridl,* 908 S.W.2d at 511; *Hearthshire Braeswood Plaza Ltd. Partnership,* 849 S.W.2d at 386. Therefore, any doubts regarding the scope of an arbitration agreement are to be resolved in favor of arbitration. *See Emerald Texas, Inc. v. Peel,* 920 S.W.2d 398, 403 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Fridl,* 908 S.W.2d at 511.

■ In support of its claims, Teco makes the following factual allegations and charges Valero with: 1) diverting business opportunities for the transportation of gas on the TransTexas Pipeline; 2) disconnecting gas from the TransTexas Pipeline and rerouting it to other Valero owned or controlled pipelines; 3) providing discounts to customers of the TransTexas Pipeline in exchange for benefits to Valero; 4) providing discounts without proper authorization; 5) discounting services on the TransTexas Pipeline to obtain higher fees for services on other facilities owned by Valero; 6) usurping opportunities for pipeline interconnects and facilities; and 7) knowingly and willfully acting to destroy the TransTexas Partnership in order to secure its own pecuniary interests.

The Operating Agreement establishes a joint venture for the purpose of operating the pipeline.[8] Section 2.02 further provides for joint management and control of the pipeline, and the appointment of the operator.[9] Section 8.02 provides that Vale-

---

8. It states:
> WHEREAS, the Parties desire to create a joint venture solely for the purpose of providing for the operation, management and maintenance of the System and to appoint VTC as the Operator thereof; ..."
>
> ⁘ ＊ ＊
>
> 2.01 *Creation of Joint Venture.* VTC and NorTex hereby establish a joint venture having the exclusive right of operating, managing and maintaining the System for the purpose of sharing the net revenues derived therefrom as specified in Article V hereof. The joint venture shall be named the "TransTexas Pipeline" and shall be referred to herein as the "Joint Venture". The Joint Venture shall file appropriate corporate charter documents in the State of Texas to permanently preserve "TransTexas Pipeline". This Operating Agreement shall not govern each Party's ownership interest in the assets of the System; the respective rights and obligations of each of the Parties

as owners are set forth and governed under the terms of the Ownership Agreement.

9. Section 2.02 states:
> 2.02 *Establishment of a Management Committee and Appointment of an Operator.* For purposes of management of the System, the Parties hereby establish a Management Committee and assign the duties and responsibilities as specified in Article III hereof. The sole responsibility for setting policies for operating, maintaining and managing the System on behalf of the Joint Venture shall be vested in the Management Committee. No Party shall be empowered to act on behalf of the Joint Venture except as specifically authorized by the Management Committee or otherwise provided herein. VTC is hereby appointed as the Operator of the System and shall provide the Joint Venture with all the services fully stated herein....

ro and Teco each has the right to use 50% of the pipeline to transport gas. Section 2.11 provides that when a party transports gas on the pipeline under its own contracts, it must account for the use by paying the Joint Venture a joint tariff of 11.9¢ for the entire 337 miles or a proportionally reduced rate for shorter distances.

Section 5.01 of the Operating Agreement establishes that revenues and costs are to be divided equally between the parties. With respect to the distribution of net revenues, section 5.02 further provides the distribution of net revenues is to be done in accordance with established accounting procedures.[10] To that end, Exhibit A to the Operating Agreement establishes the accounting procedures to be used in calculating net revenues for distribution.

Teco's causes of action depend upon the factual allegations that VTLP and Teco are joint venturers with respect to the pipeline, and that VTC is the operator. Teco asserts the purpose of the joint venture was to maximize third party revenues to be generated by the use of the pipeline. Essentially, Teco's complaints allege improper discounting of third party transportation fees and diversion of partnership or joint venture business opportunities. The Operating Agreement establishes (1) the tariff charged for transporting gas on the pipeline, and (2) that each party has an equal right to use the pipeline. We find that Teco's tort claims are so interwoven with the Operating Agreement that they cannot stand independent of it.

Teco further argues the arbitration clause is too narrow in scope to include its tort claims. This assertion is based on the assumption that its tort claims are not related to the Operating Agreement. Teco contends that "within" is at least as nar-

row as the phrase "arising under," which has been found to be too narrow to encompass unrelated torts. *See Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9 th Cir.1983) (finding "arising hereunder" is intended to cover disputes relating to the interpretation and performance of the contract itself). In any event, this argument, however, has been rejected by the *Valero Energy Corp.* court. In developing the test for intertwining tort claims, the court found any difference in an agreement to arbitrate any dispute " 'arising under this contract' " and " 'arising out of the contract' " to be "unnecessarily sophisticated." *See Valero Energy Corp.*, 777 S.W.2d at 564; *see also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4 th Cir.1988) (concluding difference between "in connection with" and "may arise out of or in relation to" is largely semantic). Moreover, to the contrary, we find the agreement to arbitrate "[a]ny dispute with respect to any matter within the Operating Agreement" is sufficiently broad to encompass related torts. *See, e.g., Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1 st Cir.1975) (concluding "any claim or controversy arising out or relating to this agreement" is broad enough to cover related torts); *Griffin v. Semperit of Am., Inc.*, 414 F.Supp. 1384, 1387 (S.D.Tex.1976) (same).

### Nonparties to the Agreement to Arbitrate

■ Teco argues that, even if its claims come within the terms of the Operating Agreement and the arbitration clause is still in full force and effect, only VTLP, as joint owner in the pipeline, and VTC, as operator of the pipeline, are entitled to arbitration. The remaining 25 Valero defendants are not parties to the Op-

10. Section 5.02 states:

> 5.02 *Distribution of Net Revenues.* The distribution of net revenues shall be as set forth in the Accounting Procedure, or as the Management Committee shall otherwise determine from time to time, for monies in

excess of anticipated working capital requirements after payment of all operating, maintenance, general and overhead expenses from revenues received by the Joint Venture.

erating Agreement and, therefore, may not seek enforcement of an arbitration agreement to which they are not parties.

In support of this contention, Teco relies on a case from the First Court of Appeals. *See Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 930 (Tex.App.-Houston [1st Dist.] 1996, no writ). In *Pepe Int'l Dev. Co.*, PIDCO and Pub entered into two contracts under which Pub would sell goods and provide services to PIDCO related to the construction of breweries in the Republic of Kazakhstan. *See id.* at 928. The contracts contained arbitration clauses. *See id.* PIDCO canceled the contracts with Pub for material breach. *See id.* Pub sued PIDCO, Moffett, secretary of PIDCO, Chappelle, president of PIDCO, and Pepe International, Inc. *See id.* The defendants sought arbitration. *See id.*

Pub argued only PIDCO was a party to the contracts and that any matter resolved through arbitration would not be enforceable as against Moffett, Chappelle, and Pepe International. *See id.* at 930. The court found the breach of contract claim against PIDCO clearly fell within the scope of the arbitration clause. *See id.* at 931. The individual claims against Moffett, Chappelle, and Pepe International, however, fell outside the scope of the arbitration clauses. *See id.* at 931. The court observed that Moffett, Chappelle, and Pepe International were not signatories to the contract and, therefore, were not subject to the contracts' provisions. *See id.*

Valero contends that because Teco has sued nonsignatories to Operating Agreement, and the allegations against the non-signatory Valero defendants are fundamentally grounded in obligations arising from the Operating Agreement, Teco is equitably estopped to deny the enforceability of the arbitration clause by the nonsignatory Valero defendants. Valero cites a number of cases in support of this argument. Teco maintains that Valero's estoppel argument is not applicable here because that theory has been decided under the Federal Act, not the Texas Act. *See, e.g., Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757–58 (11th Cir.1993); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (11th Cir.1984); *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 841 n. 9 (7th Cir.1981); *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir.1976). Teco also argues the estoppel theory is not applicable here because its claims are not fundamentally grounded or intertwined with any obligation arising from the Operating Agreement, but instead, are related to its and the joint venture's existing contracts and prospective relationships with third parties.

This court, however, has previously considered the equitable estoppel theory. *See Carlin v. 3V, Inc.*, 928 S.W.2d 291 (Tex. App.-Houston [14th Dist.] 1996, no writ). Francesco Carlin ("Carlin") and SIGMA entered into a contract ("1981 Italian agreement"). *See id.* at 292. SIGMA and 3V are sister corporations and wholly owned subsidiaries of 3V Partecipazioni Industrial S.p.A. *See id.* The parent and subsidiary corporations manufacture, sell, and distribute specialty chemical products. *See id.* Under the 1981 Italian agreement, Carlin was to provide technical expertise with respect to the development of PVC suspendants, "Polivic." *See id.* Prior to the termination of the 1981 Italian agreement, SIGMA assigned to 3V the rights to sell, manufacture, and distribute Polivic. *See id.* After the 1981 Italian agreement expired, Carlin and·others developed other PVC suspendants. *See id.*

3V sued Carlin and Compagnia Italiana Di Ricerca e Sviluppo S.R.L. ("CIRS") for breach of the 1981 Italian agreement and related torts. *See id.* at 292–93. 3V argued because it was not a party to the 1981 Italian agreement, it was not bound by its terms, including the arbitration agreement. *See id.* at 294. This court disagreed, first noting that 3V based its entire case on the rights it acquired in the

1981 Italian agreement and would have no case if the agreement did not exist. *See id.* at 295.

The *Carlin* court noted that other cases, finding that the claims of the nonsignatory party arise out of an agreement containing an arbitration clause, and the nonsignatory would have no claim in the absence of the underlying agreement, the arbitration clause was enforceable against the nonsignatory. *See id.* at 295–96 (citing *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4 th Cir.1988) (stating that when the claims against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement)); *Merrill Lynch v. Eddings*, 838 S.W.2d 874, 879 (Tex.App.-Waco 1992, writ denied) (holding that nonsignatory settlor and trust beneficiaries could be compelled to arbitrate under account agreement between trustee and Merrill Lynch, which contained an arbitration clause, because agreement was the underlying basis for all the claims of the beneficiaries and there would have been no claims without the agreement)).

In a discussion on the doctrine of equitable estoppel, the *Carlin* court observed that cases applying the doctrine were decided on the same ultimate fact, i.e., that each party must rely on the terms of the written agreement in asserting its claims. *See id.* at 296 (citing *Sunkist Soft Drinks, Inc.*, 10 F.3d at 757–58; *J.J. Ryan & Sons, Inc.*, 863 F.2d at 320–21; *McBro Planning & Dev. Co.*, 741 F.2d at 344; *Hughes Masonry Co.*, 659 F.2d at 841 n. 9). Moreover, the focus of the inquiry in each case was a determination of the nature of the underlying claims asserted by the party resisting arbitration, and whether these claims were within the scope of the arbitration clause contained in the agreement. *See id.*

The *Carlin* court, finding that all of 3V's claims arose out of and were directly related to the 1981 Italian agreement, concluded 3V was equitably estopped from avoiding arbitration of its claims even though it was not a signatory to the agreement. *See id.* at 297.

Here, Teco has alleged the other Valero defendants are either subsidiary, parent, or sister corporations of VTLP and VTC, or in the case of McLelland and Greehey, officers and directors of the various Valero defendants. Teco has brought the same claims against the nonsignatory Valero defendants as against VTLP and VTC. Specifically, Teco asserts that the Valero defendants acted "in concert to thwart the legitimate purposes of the Partnership." Having already found Teco's claims come within the scope of the Operating Agreement's arbitration clause, we conclude Teco must rely on the terms of the Operating Agreement in asserting its claims against the nonsignatories. Because Teco's claims against VTLP, VTC, and the other defendants are based on the same operative facts and are inherently inseparable, we hold the nonsignatory Valero defendants may also compel arbitration of Teco's claims against them. *See Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5 th Cir.1976) (explaining the claims against nonsignatory defendants, including the parent corporation of signatory defendant, were based on the same operative facts and were inherently inseparable from the claims against the signatory defendant).[11]

11. Moreover, several federal circuit decisions have found that nonsignatories to arbitration agreements may be bound by the agreement under ordinary contract and agency principles. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1122 (3d Cir. 1993) (claims against sister corporation fall within arbitration agreement based on agency principles); *Arnold v. Arnold Corp.-Printed Communications for Bus.*, 920 F.2d 1269, 1282 (6 th Cir.1990) (nonsignatory defendants allegedly committed acts related to running of corporation in shareholder suit); *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187 (9 th Cir.1986) (individual defendants' allegedly wrongful acts related to handling of

## Waiver

■ Finally, Teco argues Valero has waived enforcement of the arbitration clause by its previous litigation. A party waives its right to arbitration if it substantially invokes the judicial process to the detriment of the opposing party. *See Turford v. Underwood,* 952 S.W.2d 641, 643 (Tex.App.-Beaumont 1997, orig. proceeding); *Marble Slab Creamery, Inc. v. Wesic, Inc.,* 823 S.W.2d 436, 438 (Tex.App.-Houston [14th Dist.] 1992, no writ). To establish waiver, Teco bears the burden of showing Valero acted inconsistently with the arbitration agreement and that it was prejudiced by such conduct. *See In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d at 574; *Turford,* 952 S.W.2d at 643. There is a strong presumption against waiver, which must be intentional and may only be implied from a party's actions if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. *See Turford,* 952 S.W.2d at 643. Therefore, any doubts regarding waiver should be resolved in favor of arbitration. *See In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d at 574. Whether a party waives arbitration is a question of law. *See id.; Nationwide of Bryan, Inc.,* 969 S.W.2d at 521.

In 1985, Valero filed suit against Inter-North, NorTex and HNG when Inter-North merged with HNG to form Enron. Valero asserted the merger violated Nor-Tex's fiduciary duties under the Ownership Agreement. In 1987, Valero sued Enron, NorTex and Teco in an attempt to block the sale to Teco. Teco argues that Valero's previous litigation waives its right to enforce arbitration in the underlying litigation. Teco, in particular, complains the Ownership Agreement includes an arbitration clause similar to the one found in the Operating Agreement. Several courts have rejected similar contentions. *See, e.g., Lawrence v. Comprehensive Bus.*

*Servs. Co.,* 833 F.2d 1159 (5th Cir.1987) (finding that a party who brings or participates in previous litigation does not forfeit the contractual right to compel arbitration as to all future disputes on the same contract); *Insurance Co. of N. Am. v. J.A. Jones Constr. Co.,* 1995 WL 295280, at *4 (E.D.La.1995) (same); *Transwestern Pipeline Co. v. Horizon Oil & Gas Co.,* 809 S.W.2d 589, 593 (Tex.App.-Dallas 1991, writ dism'd w.o.j.) (stating that appellee's argument that appellant had settled a previous dispute without compelling arbitration is "of no import in the instant case"). "It has long been the law in this state that even though a party may have once waived a contract right in the past, it may enforce that right in the future by giving notice of its intention to do so." *Transwestern Pipeline Co.,* 809 S.W.2d at 592.

The United States Fifth Circuit Court of Appeals has addressed facts similar to those at hand. In *Lawrence v. Comprehensive Bus. Servs. Co.,* Comprehensive had sued the Lawrences in Illinois small claims court for payment of services it had provided under a franchise agreement, and obtained a judgment. 833 F.2d at 1161. The Lawrences, in turn, sued Comprehensive in Texas state court seeking a declaratory judgment that the agreement was illegal and unenforceable, therefore, freeing them of any further liability under it. *See id.* Comprehensive removed that cause of action to federal court and moved to stay the litigation and compel arbitration pursuant to the arbitration clause in the franchise agreement. *See id.*

The Lawrences argued Comprehensive had waived arbitration by its earlier action on the same agreement. *See id.* at 1164. The court found Comprehensive's previous suit in Illinois did not substantially invoke the judicial process to the Lawrences' detriment in the present suit. *See id.* at 1165. The court further observed the Lawrences

---

plaintiff's securities account as agents of brokerage house). Teco alleges the Valero defendants acted as agents by entering into third

party transportation contracts on behalf of the joint venture.

had not suggested Comprehensive either delayed its demand for arbitration or shown the earlier suit prejudiced their present claim. *See id.*

Similarly, Teco has not claimed Valero either delayed its demand for arbitration or explained how any previous litigation prejudices arbitration of its present claims. We hold Valero has not waived its right to enforce arbitration.

## Conclusion

We sustain both of Valero's points of error. Accordingly, the judgment of the trial court is reversed and remanded for proceedings consistent with this opinion. Our opinion moots all pending motions which were taken with the case.