Opinion issued May 22, 2003

















In The
Court of Appeals
For The
First District of Texas




NO. 01-02-01228-CV




IN RE KRAFT FOODS NORTH AMERICA, INC. AND SUPERIOR
AGRESOURCE, INC., Relators 




Original Proceeding on Petition for Writ of Mandamus







MEMORANDUM OPINION
          By petition for writ of mandamus, relators, Kraft Foods North America, Inc.
(Kraft) and Superior AgResource, Inc., challenge the trial court’s September 30, 2002
order denying their motion to compel arbitration between them and real party in
interest, Trafalgar Holdings, Inc. (Trafalgar). We conditionally grant the petition.
Factual and Procedural Background
          Kraft manufactures food products. As a result of the manufacturing process,
Kraft produces food-waste byproducts. Kraft built a facility in Goshen, California to
process the food waste into animal feed. The Goshen facility never became fully
operational, and Kraft decided to sell it. Kraft determined that the buyer of the
facility should possess expertise in the processing of food waste. Kraft also desired
to enter into a contract to process its food waste on a nationwide basis with whomever
purchased the Goshen facility. To this end, in 1994, Kraft began negotiations with
Trafalgar, a company that had extensive experience in managing and operating plants
that processed food waste into animal feed. As part of the negotiations, Kraft and
Trafalgar entered into an “Interim Agreement” on April 17, 1997.
          With regard to its purpose and term, the Interim Agreement provided as
follows:
(a) Purpose. The purpose of this Agreement is to document the
arrangement whereby [Trafalgar] is granted the opportunity to observe
the operation of the Goshen facility first-hand and to make suggestions
to [Kraft] management regarding changes to the operation of the Goshen
Facility which will enable [Trafalgar] to determine whether the Goshen
Facility has processing and economic viability to and for [Trafalgar’s]
purposes, such that [Trafalgar] desires to purchase it. Additionally,
[Trafalgar] will undertake such activities as it deems necessary to enable
itself to determine whether it desires to construct facilities to process the
Organic Waste streams of [Kraft’s] facilities in those regions under a
supply agreement whereby [Trafalgar] will handle, transport, and
process [Kraft’s] Organic Waste streams from all or the vast majority of
its manufacturing facilities nation-wide (“Supply Agreement”) . . . .
 
(b) Term. [Trafalgar] understands and agrees that [Kraft’s] needs
dictate that a decision be made on or before July 31, 1997, as to whether
[Kraft] will sell and [Trafalgar] will buy the Goshen facility, [Trafalgar]
will construct a facility to service [Kraft’s] facilities in the Northeast,
and [Kraft] and [Trafalgar] will enter into a Supply Agreement. 
Therefore, [Trafalgar] must advise [Kraft] in writing on or before such
date that it intends to purchase the Goshen facility and to enter into a
Supply Agreement and to construct a facility in the Northeast in order
to perform its services under the Supply Agreement, all subject to the
execution of mutually agreed contracts for same. If [Kraft] does not
receive such notice by such date, this Agreement shall be terminated
thereafter, and neither party shall have any further obligations
hereunder, other than such as arose prior to such termination, unless this
Agreement is extended by the written agreement of the parties.
          The Interim Agreement gave Trafalgar a “Right of First Negotiation,”
described as follows:
In the event that on or before July 31, 1997, [Trafalgar] notifies [Kraft]
in writing that, it has completed its due diligence relating to the Goshen
Facility, [Kraft’s] Organic Waste streams, and the proposed Northeast
animal feed facility, and, as a result thereof, has determined that it
desires to purchase the Goshen facility, to enter into the Supply
Agreement with Company, and that it intends to construct an animal
feed facility . . . [,] [t]he parties hereby agree to negotiate in good faith
for a mutually acceptable definitive agreement for the sale and purchase
of the Goshen facility; and for a mutually acceptable Supply Agreement.
          Although it had not yet “observed” the Goshen facility, Trafalgar sent a letter
to Kraft dated July 31, 1997, stating that Trafalgar desired to begin negotiations to
purchase the facility and to execute the Supply Agreement. In response, Kraft’s in-house counsel sent Trafalgar a letter dated August 5, 1997, acknowledging that Kraft
had received Trafalgar’s July 31 letter. Kraft’s August 5 letter also stated that
Trafalgar had failed to complete its due diligence of the Goshen Facility and outlined
numerous other concerns that Kraft had that were related to Trafalgar’s proposal. 
Kraft concluded the letter by stating, 
[P]lease understand that Kraft cannot commit to commencing
negotiations under the Interim Agreement for either the sale of Goshen
facility or a long-term supply agreement until such time as it has
sufficient information to determine whether Trafalgar’s proposal is
feasible, cost effective, timely and will fulfill Kraft’s needs.
          On August 28, 1997, Kraft’s in-house counsel sent another letter to Trafalgar,
which stated in relevant part as follows:
Please be advised that we will not at this time extend the Interim
Agreement which expired July 31, since Trafalgar still has not provided
enough specific information to Kraft for Kraft to be able to evaluate the
proposal for Trafalgar to purchase Kraft’s Goshen facility and to provide
organic waste disposal services to Kraft. The information Kraft needs
was discussed at some length this morning, and this letter will reconfirm
those needs. . . .
 
We are looking to Trafalgar to send to us a detailed written
proposal and terms for the purchase of the Goshen facility, and a
separate detailed written proposal for implementation of the organic
waste disposal system Trafalgar is recommending for Kraft’s Lowville
facility. . . .
 
. . . .
 
As you know, we continue to fight time constraints in addressing
and resolving our organic waste disposal issues, . . . . Therefore we
must ask that you respond to all of the above, other than the Lowville
information no later than October 1, 1997. If we do not receive all of
the requested information by that date, we will be forced to recommence
also pursuing third party alternative solutions for disposing of our
organic wastes. 
 
As we discussed today, we continue our data collection efforts for
Lowville, as well as our efforts to ready the Goshen facility for a full
speed production run. We ask that you sign this letter below and return
it to me. To acknowledge and confirm the above and that the provisions
set forth in Sections 6 [“No Conflict of Interest; Proper Conduct;
Covenant Not to Compete”], 7 [“Confidential Information and the
Results of Services”], and 11 [“Indemnification”] will apply with respect
to Kraft’s confidential information and with respect to Trafalgar’s
actions in furtherance of the above. . . .
          Trafalgar later signed the August 28 letter and returned it to Kraft. Despite
continued negotiations between Kraft and Trafalgar, Kraft ultimately sold the Goshen
facility to another party in 2000.
          Trafalgar and Peter Smetek & Associates, Inc.


 filed suit against Kraft and
Superior AgResource, Inc.


 asserting claims based on fraudulent inducement,
negligent misrepresentation, quantum meruit, breach of contract, breach of fiduciary
duty, unjust enrichment, conversion, and misappropriation of trade secrets. In its
Second Amended Petition—the live pleading at the time that the trial court denied the
motion to compel arbitration—Trafalgar made the following factual allegations in
support of its claims:
          •        In 1994, Kraft approached Trafalgar to enter into a transaction to
purchase certain assets, including the Goshen facility and the right to
procure all organic waste from Kraft (“subject assets”).
 
          •        In November 1994, Kraft represented that the value of the subject assets
over a 10-year period would be $1,300,000,000.
 
          •        Trafalgar began an investigation of the representations made by Kraft
regarding the subject assets. Trafalgar discovered that many of the
representations were false or inaccurate.
 
          •        In September 1997, Trafalgar visited the Goshen plant. Trafalgar 
discovered that the processes at the facility were flawed and inefficient.
 
          •        Throughout the parties’ relationship, Kraft requested Trafalgar to
formulate recommendations regarding enhancing the profitability of the
Goshen facility and assisting Kraft in handling certain environmental
problems.
 
          •        Trafalgar rendered consulting services to Kraft, for which Kraft agreed
to pay, or for which it should have to pay.
 
          •        In November 1997, representatives of Trafalgar and Kraft met and
reached a final agreement on all material terms for Trafalgar to acquire
the subject assets.
 
          •        The terms and finality of the agreement were confirmed in subsequent
meetings; however, the agreement was never reduced to writing.
 
          •        With regard to the consulting services that Trafalgar provided to Kraft,
Trafalgar set an artificially low fee. Trafalgar did so based on the
understanding that it would acquire the subject assets at the conclusion
of performing the consulting services.
 
          •        Trafalgar continued to render consulting services to Kraft through
January 1998.
 
          •        Trafalgar’s fee for the consulting services rendered to Kraft was
$1,005,000; Kraft paid $319,000 of that fee.
 
          •        In November 1997, Kraft suggested that the then-outstanding balance
of the fees be applied toward the purchase price of the subject assets. 
Trafalgar agreed to forego the payment of its fees on this basis.
 
          •        Kraft ultimately sold the subject assets to another party.
 
          •        In November 1997, Kraft misrepresented its intention to sell Trafalgar
the subject assets. Alternatively, if Kraft intended to sell the subject
assets to Trafalgar in November 1997, Kraft subsequently decided to sell
the subject assets to another party and failed to disclose that fact to
Trafalgar.
          •        Trafalgar relied on these misrepresentations by Kraft to its detriment in
(1) continuing to provide consulting services at a reduced fee; (2)
agreeing to apply its outstanding fees for consulting services to the
purchase price of the subject assets; (3) providing Kraft with Trafalgar’s
trade secret information; and (4) spending time, money, and effort in
continuing to negotiate with Kraft regarding the purchase of the subject
assets.

          Kraft filed a motion to compel arbitration based on an arbitration provision
found in section 20 of the Interim Agreement, which “provision” provided, in
relevant part, as follows:
[Trafalgar] and [Kraft] shall and do hereby irrevocably submit and
consent to resolve all disputes, claims, or other actions arising out of or
related to this Agreement by arbitration in the State of Illinois in
accordance with the then current commercial rules of the American
Arbitration Association and hereby irrevocably waive any and all
objections to arbitration. The arbitration shall be governed by the
United States Arbitration Act, 9 U.S.C. Section 1–16 (as may be
amended) . . . .

          Importantly, section 24 of the Interim Agreement contained a “survivability”
provision, which stated, “The provisions of Sections 6(c), 6(d), 7, 9, 11, 19, 20 and
this Section 24 will survive any termination of this Agreement.” Thus, the arbitration
provision expressly survived the termination of the Interim Agreement.
          Trafalgar filed a response in opposition to Kraft’s motion to compel arbitration. 
Trafalgar asserted that Kraft’s August 28 letter revoked the arbitration agreement and
that its claims in the lawsuit did not arise out of, or relate to, the Interim Agreement. 
The trial court denied Kraft’s motion to compel arbitration. This petition for
mandamus followed.
Standard of Review 
          In the arbitration provision of the Interim Agreement, the parties agreed to
arbitrate under the Federal Arbitration Act (FAA).


 9 U. S. C. §§ 1–16. Thus, the
trial court’s ruling is reviewable by mandamus, rather than by interlocutory appeal. 
Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992). 
          A writ of mandamus will issue to correct a clear abuse of discretion for which
the remedy by appeal is inadequate. Walker v. Packer, 827 S.W.2d 833, 839 (Tex.
1992). With respect to factual issues, an abuse of discretion is shown if the trial court
could reasonably have reached only one decision and failed to do so. Id. at 839-40. 
With respect to questions of law, however, “[a] trial court has no ‘discretion.’ ” Id.
at 840. Therefore, “a clear failure by the trial court to analyze or apply the law
correctly will constitute an abuse of discretion.” Id. 
Discussion
A.      Law of Arbitration under the FAA
          When a party asserts a right to arbitrate under the FAA, the question of whether
the dispute is subject to arbitration is determined under federal law. Prudential Secs.
Inc. v. Marshall, 909 S.W.2d 896, 899 (Tex. 1995). As a matter of federal law, any
doubts concerning the scope of arbitrable issues are resolved in favor of arbitration,
whether pertaining to the construction of the contract or a defense to arbitration. See
In re Serv. Corp. Int’l, 85 S.W.3d 171, 174 (Tex. 2002).
          In determining whether to compel arbitration, a court must decide two issues: 
(1) whether a valid, enforceable arbitration agreement exists and, (2) if so, whether
the claims asserted fall within the scope of the agreement. In re Oakwood Mobile
Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999). A court has no discretion and must
compel arbitration if the answer to both questions is affirmative. In re Tenet
Healthcare, Ltd., 84 S.W.3d 760, 765 (Tex. App.—Houston [1st Dist.] 2002, orig.
proceeding). 
B.      Was there a valid, enforceable agreement to arbitrate?
          “‘A party cannot be required to arbitrate unless it has agreed to do so.’” Trico
Marine Servs., Inc. v. Stewart & Stevenson Technical Servs., 73 S.W.3d 545, 548
(Tex. App.—Houston [1st Dist.] 2002, no pet.) (combined appeal and orig.
proceeding) (quoting Hou-Scape, Inc. v. Lloyd, 945 S.W.2d 202, 205 (Tex.
App.—Houston [1st Dist.] 1997, orig. proceeding)). “The parties’ agreement to
arbitrate must be clear. In this determination, Texas contract law applies.” Trico
Marine Servs., 73 S.W.3d at 548 (citations omitted). Trafalgar disputes the existence
of a valid, enforceable arbitration agreement. Whether an enforceable agreement to
arbitrate exists is a legal question entitled to de novo review. Mohamed v. Auto
Nation USA Corp., 89 S.W.3d 830, 835 (Tex. App.—Houston [1st Dist.] 2002, no
pet.) (combined appeal and orig. proceeding); In re Kellogg Brown & Root, 80
S.W.3d 611, 615 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding). 
          A party seeking to compel arbitration has the initial burden to establish the
arbitration agreement’s existence and to show that the claims asserted fall within the
agreement’s scope. Mohamed, 89 S.W.3d at 836; Kellogg Brown & Root, 80 S.W.3d
at 615. If the party seeking arbitration carries its initial burden, the burden then shifts
to the party resisting arbitration to present evidence on its defenses to the arbitration
agreement. Oakwood Mobile Homes, 987 S.W.2d at 573; Mohamed, 89 S.W.3d at
836. 
          Kraft attached a copy of the Interim Agreement, containing the arbitration
provision, to its motion to compel arbitration. Thus, Kraft met its burden of
presenting evidence of an arbitration agreement between it and Trafalgar. See In re
Conseco Fin. Serv. Corp., 19 S.W.3d 562, 569 (Tex. App.—Waco 2000, orig.
proceeding). To avoid being compelled to arbitrate claims within the scope of that
agreement, Trafalgar had to come forward with “grounds as exist at law or in equity
for the revocation of any contract.” 9 U. S. C. § 2 (1997).
          Trafalgar does not deny that the Interim Agreement contained an arbitration
provision; rather, it contends that Kraft’s August 28 letter modified the Interim
Agreement and constituted a new contract between the parties, taking the place of the
Interim Agreement. Trafalgar points out that this new agreement did not incorporate
the arbitration provision and, in fact, purposefully excluded it. In support of this
contention, Trafalgar cites to the following language in the August 28 letter:
. . . We ask that you sign this letter below and return it to me to
acknowledge and confirm the above and that the provisions set forth in
Sections 6 [“No Conflict of Interest; Proper Conduct; Covenant Not to
Compete”], 7 [“Confidential Information and the Results of Services”],
and 11 [“Indemnification”] will apply with respect to Kraft’s
confidential information and with respect to Trafalgar’s actions in
furtherance of the above. . . .
Trafalgar claims that this language created a new survivability provision. It points
out that conspicuously absent from the “new” survivability provision is section 20 of
the Interim Agreement—the arbitration provision. 
          Kraft asserts that the arbitrator, and not the trial court, should decide the effect
of the August 28 letter agreement. We disagree. 
          The facts here are analogous to those in Valero Energy Corp. v. Teco Pipeline
Co., 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, no pet.). In Valero, the
court addressed whether an arbitration clause had been revoked by a subsequent
settlement agreement between the parties. Id. at 586. The Valero court recognized
that it was for the court to determine whether a later agreement between the parties
revoked an arbitration clause because “[w]ithout an agreement to arbitrate, arbitration
cannot be compelled.” Id. (quoting Freis v. Canales, 877 S.W.2d 283, 284 (Tex.
1994)). After considering the subsequent settlement agreement between the parties,
the court held that it modified only certain enumerated provisions in the parties’
original contract and that the arbitration clause was not one of them. Valero, 2
S.W.3d at 588-89.
          Based on Valero, we agree with Trafalgar that it was appropriate for the trial
court in this case to determine whether the August 28 letter between the parties served
to revoke effectively the arbitration provision. However, also relying on the
reasoning in Valero, we disagree that the August 28 letter served to revoke the
arbitration agreement contained in the Interim Agreement. Nothing in Kraft’s letter
expressly provided that the letter served to “modify” the Interim Agreement or, in
particular, its survivability or arbitration provisions. Rather, the August 28 letter
terminated the Interim Agreement and evidenced the continued negotiations between
Kraft and Trafalgar related to the purchase of Kraft’s assets. The letter outlined
additional conditions of performance for Trafalgar, such as providing Kraft with a
separate written proposal for its Lowville facility. Thus, the provisions of the August
28 letter evolved from the Interim Agreement, rather than supplanted it. Moreover,
the portion of the letter that Trafalgar claims modified the survivability provision
stated that the confidentiality, non-competition, and indemnification provisions of the
Interim Agreement applied to Trafalgar’s performance of the additional conditions
set out in the August 28 letter. That portion of the letter does not state that the
survivability or arbitration provisions found in the Interim Agreement were in any
manner revoked or amended. 
          Although the present facts differ from those of Valero, the similarities
outweigh the differences. See id. The absence of a clearly expressed intent in the
August 28 letter to revoke the arbitration clause is paramount. Moreover, as
previously mentioned, we must evaluate this issue within the context of the
presumption in favor of agreements to arbitrate under the FAA. See Prudential Secs.,
909 S.W.2d at 898. Accordingly, we hold that the arbitration provision in the Interim
Agreement remained valid and enforceable.
C.      Were the claims within the scope of the agreement?
          We next consider whether Trafalgar’s claims fall within the scope of the
arbitration provision. Whether a claim is within the scope of an agreement to
arbitrate is a matter of contract interpretation and thus a question of law for the court. 
AT & T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 649,
106 S. Ct. 1415, 1418-19 (1986); Tenet Healthcare Ltd. v. Cooper, 960 S.W.2d 386,
388 (Tex. App.—Houston [14th Dist.] 1998, pet. dism’d w.o.j.); City of Alamo v.
Garcia, 878 S.W.2d 664, 665 (Tex. App.—Corpus Christi 1994, no writ). 
          Federal policy strongly favors arbitration and resolves all doubts concerning
arbitrability in favor of arbitration. Moses H. Cone Mem. Hosp. v. Mercury Constr.
Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 941 (1983); Prudential Secs., 909 S.W.2d
at 898; Hou-Scape, 945 S.W.2d at 205. Any doubts as to whether a claim falls within
the scope of the agreement must be resolved in favor of arbitration. See Prudential
Secs., 909 S.W.2d at 899. Thus, a court should not deny a motion to compel
arbitration “‘unless it can be said with positive assurance that an arbitration clause is
not susceptible of an interpretation which would cover the dispute at issue.’” Id.
(quoting Neal v. Hardee’s Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990)).
          To determine whether a claim falls within the scope of an arbitration
agreement, the court looks at the terms of the agreement and the factual allegations
in the petition. Prudential Secs., 909 S.W.2d at 900; Hou-Scape, 945 S.W.2d at 205. 
Generally, if the facts alleged “touch matters,” have a “significant relationship” to,
are “inextricably enmeshed” with, or are “factually intertwined” with the contract that
is subject to the arbitration agreement, the claim will be arbitrable. See Hou Scape,
945 S.W.2d at 205-06 (citing cases). In other words, to be within the scope of an
arbitration provision, the allegations need only be factually intertwined with
arbitrable claims or otherwise touch upon the subject matter of the agreement
containing the arbitration provision. See Prudential Secs., 909 S.W.2d at 900. Here,
the arbitration provision provided that “all disputes, claims, or other actions arising
out of, or related to, [the Interim Agreement]” would be subject to arbitration. Such
broad language within the context of an arbitration agreement has been held to favor
arbitration. See Hou Scape, 945 S.W.2d at 205-06 (citing cases). 
          We consider whether the facts alleged by Trafalgar in support of its claims
“touch matters” covered by the Interim Agreement. See id. at 205. Trafalgar
carefully crafted its Second Amended Petition to omit any reference to the Interim
Agreement as a basis for its claims. In fact, the petition unequivocally disavows that
Trafalgar’s claims relate to the Interim Agreement. However, the mandamus record
belies such assertion. 
          The Interim Agreement was integral to the negotiation process for the subject
assets. It required Trafalgar to perform certain acts of due diligence before it could
purchase the assets and gave Trafalgar the right of first negotiation. The August 5
and 28, 1997 letters make clear that the negotiations between the parties, which
ultimately culminated in the alleged November 1997 agreement on which Trafalgar
bases some of its claims, continued to evolve from the Interim Agreement. 
          As pointed out by Kraft, the parties disagree about whether they entered into
the November 1997 agreement. A determination of whether the agreement was
consummated will necessarily entail an examination of (1) the parties’ performance
pursuant to the Interim Agreement; (2) the purpose of the Interim Agreement; and 
(3) the role that the Interim Agreement played in the negotiations that led to the
alleged November 1997 agreement. 
          Moreover, the Interim Agreement expressly contemplated that the parties
would contract separately for the purchase of the Goshen facility and to receive
Kraft’s food waste. Trafalgar claims that the November 1997 agreement comprised
such an agreement. Trafalgar’s breach-of-contract claim, therefore, relates to or
touches upon the Interim Agreement. Stated differently, given the obvious purpose
of the Interim Agreement to effectuate a later agreement between the parties for the
purchase of the subject assets, we are unable to say with positive assurance that the
dispute surrounding the existence of the 1997 agreement is not subject to the broadly
written arbitration clause contained in the Interim Agreement.
          Trafalgar also brings claims against Trafalgar for unpaid consulting-service
fees. The Interim Agreement provided that Trafalgar would perform consulting
services related to the Goshen facility to Kraft without charge. The Interim
Agreement also provided that the parties might agree to consulting services “not
otherwise contemplated” by the agreement. Thus, an evaluation of the consulting
services performed by Trafalgar under the Interim Agreement vis-a-vis the other
consulting services that it performed for Kraft under any other agreements would be
necessary to determine Kraft’s liability. Accordingly, Trafalgar’s claim for unpaid
consulting-service fees is necessarily intertwined with the Interim Agreement.
          Trafalgar also claims that Kraft wrongfully obtained Trafalgar’s trade secrets. 
However, the Interim Agreement implicitly provided that Trafalgar’s trade secrets
would be shared with Kraft during the due-diligence process. Any determination of
whether Kraft wrongfully required Trafalgar’s trade secrets will first require a
determination of which trade secrets Kraft acquired pursuant to the Interim
Agreement. Thus, Trafalgar’s claims regarding Kraft’s wrongful acquisition of trade
secrets touch upon, relate to, and are intertwined with the Interim Agreement.
          We hold that Trafalgar’s claims lie within the scope of the arbitration provision
and are subject to arbitration. 
                                                     CONCLUSION
          Because Kraft established the existence of an arbitration agreement and
demonstrated that Trafalgar’s claims were within the scope of that agreement, the trial
court had no discretion to deny Kraft’s motion to compel arbitration. See Oakwood
Mobile Homes, 987 S.W.2d at 573. We conditionally grant the writ of mandamus and
direct the trial court to order that Trafalgar’s claims proceed to arbitration. Writ will 
 

issue only if the trial court fails to do so. 




                                                             Laura Carter Higley
                                                             Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Higley.