In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00154-CV


______________________________




MICHAEL F. LOY, FLEETWOOD ENTERPRISES, INC., AND FLEETWOOD 

 RETAIL CORPORATION, F/K/A HOMEUSA, INC., Appellants


V.



STEVEN HARTER, NOTRE CAPITAL VENTURES, II, L.L.C., AND NOTRE 

 CAPITAL VENTURES, III, L.L.C., Appellees



 


On Appeal from the 127th Judicial District Court


Harris County, Texas


Trial Court No. 00-22192




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 The merger hung in the balance when Michael F. Loy, then the Chief Financial Officer
(C.F.O.) and a director and stockholder of HomeUSA, Inc. (HomeUSA), and Steven Harter, then a
director and stockholder of that company, faced each other in the hallway during a break in
negotiations concerning a proposed merger (1) of HomeUSA into Fleetwood Enterprises, Inc.
(Fleetwood). The content of their discussion in that hallway is the subject of conflicting evidence,
primarily concerning whether there was any agreement then made between the two men, but all
parties agree the Loy-Harter meeting was followed by the successful completion of the merger. That
fateful discussion, however, spawned the multi-party litigation from which these appeals by Loy and
Fleetwood arise.

 After the merger, Fleetwood, the surviving corporation, reassigned Loy. Loy claimed he had
been constructively terminated and sued Fleetwood. That action was arbitrated, and Loy was
awarded money, which he accepted in exchange for his release of Fleetwood.

 Loy then sued Harter and Harter's companies, Notre Capital Ventures, II, L.L.C., and Notre
Capital Ventures, III, L.L.C. (the two companies herein collectively called "Notre Capital"), claiming
that, to pave the way for the merger, Harter induced Loy to waive an important provision in his
personal employment contract with HomeUSA (2) by promising to provide Loy with part of three new
public offerings (herein IPOs). Loy admitted in his pleadings that he received from Harter an interest
in one IPO and that he made $124,850.00 on it, but claimed Harter had promised him interests in
three IPOs. Harter agrees a hallway discussion occurred, but insists he made Loy no such promise. 
On all evidence disputed between Loy and Harter, the trial court, acting as fact-finder, believed
Harter, not Loy. (3) The trial court thus ordered that Loy take nothing. Harter, as former director of
HomeUSA (now Fleetwood), also claimed that, under an indemnity contract between Harter and
HomeUSA, as well as under HomeUSA's bylaws and under Texas' common law, Fleetwood, as
HomeUSA's successor, must indemnify him for defense expenses-attorney's fees of about
$200,000.00-incurred defending himself in the Loy lawsuit. The trial court agreed.

 Fleetwood was not a party to Loy's lawsuit. Fleetwood, however, filed its own lawsuit
against Loy based on Loy's judicial admission in his suit against Harter, in which Loy, in the course
of alleging Harter had promised him interests in three IPOs, admitted receiving the interest in one
IPO from Harter. In a partial summary judgment rendered in Fleetwood's suit against Loy, Loy was
ordered to pay Fleetwood the money he admitted making off the one Harter IPO-based on the
premise that, in making the deal, Loy breached his duties to Fleetwood's predecessor, HomeUSA.

 Loy appeals, contending Fleetwood's suit against him must go to arbitration as required by
the arbitration clause in his employment contract. He alternatively argues that res judicata prevents
Fleetwood from bringing its claim against him, because Fleetwood should have raised it at the
arbitration that followed the termination of his employment.

 Fleetwood appeals, contending the indemnity provision does not cover Harter's actions or the
costs of defending Loy's claims.

 Harter won on all counts and has not appealed.

I. Loy's Appeal

 A. Arbitration

 We first address Loy's contention that Fleetwood's claims against him were subject to
mandatory arbitration under the terms of his employment contract and therefore should not have
been addressed by the trial court. (4) Loy's fallback position is that Fleetwood's claims are barred by
res judicata, because his employment contract, the contract's terms, and the amount due to him under
the contract were the explicit subject of an arbitration.

 Arbitration of disputes is strongly favored. EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 90
(Tex. 1996); Prudential Sec., Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995). In determining
whether the claims fall within the scope of an arbitration agreement, a court must focus on the factual
allegations of the complaint, rather than on the legal causes of action asserted. Marshall, 909
S.W.2d at 900. The burden is on the party opposing arbitration to show that their claims fall outside
the scope of the arbitration agreement. Id. Once an agreement to arbitrate has been shown to exist,
a matter not in dispute here, the party resisting arbitration bears the burden of proving that the matter
in dispute is not within the scope of the arbitration agreement. Id. The policy favoring arbitration
is so strong that courts should not deny arbitration "unless it can be said with positive assurance that
an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." 
Id. at 899.

 In this case, the employment contract reads, in pertinent part, as follows:

 Arbitration. . . . [A]ny unresolved dispute or controversy arising under or in
connection with this Agreement shall be settled exclusively by arbitration, . . .
provided that Employee shall comply with Employer's grievance procedures in an
effort to resolve such dispute or controversy before resorting to arbitration . . . . The
arbitrators shall not have the authority to add to, detract from, or modify any
provision hereof nor to award punitive damages to any injured party. The arbitrators
shall have the authority to order back pay, severance compensation, vesting of
options (or cash compensation in lieu of vesting of options), reimbursement of costs,
including those incurred to enforce this Agreement, and interest thereon in the event
the arbitrators determine that Employee was terminated without disability or good
cause  .  .  .  or  that  Employer  has  breached  this  Agreement  in  any  material 
respect . . . .


(Emphasis added.)

 Loy contends that Fleetwood's allegations all necessarily "aris[e] under or in connection with"
his employment agreement, because they are based on Fleetwood's position that he waived a clause
of his employment contract because he was paid to do so. Fleetwood argues that its claim is based
solely on breach of a fiduciary duty that existed independently of the employment contract; thus, the
contract is not involved.

 The precise duty Loy was alleged-and found-to have breached is important to a proper
analysis of the scope of the arbitration provision. Loy's vote as a director of HomeUSA, in favor of
approving the merger-and not his waiver of the change of control provision, which he had been
personally given in his employment contract-must have been the act that breached his fiduciary duty
to HomeUSA (now Fleetwood), as found by the trial court. The question before us, then, is whether
Fleetwood's claim against Loy for "selling" his vote as a director is something that "aris[es] under
or in connection with" Loy's employment agreement.

 In the face of an arbitration clause, the arbitration of tort claims should be evaluated under
the following standard set out by Fridl v. Cook, 908 S.W.2d 507 (Tex. App.-El Paso 1995, writ
dism'd w.o.j.):

 [W]hether the particular tort claim is so interwoven with the contract that it could not
stand alone or, on the other hand, is a tort completely independent of the contract and
could be maintained without reference to the contract. Valero Energy Corp. v.
Wagner & Brown, 777 S.W.2d 564, 566 (Tex. App.-El Paso 1989, writ denied).


Id. at 511. If the arbitration clause is broad, arbitration of a tort claim will be ordered unless "it can
be said with positive assurance that the particular dispute is not covered." Dallas Cardiology
Assocs., P.A. v. Mallick, 978 S.W.2d 209, 214 (Tex. App.-Texarkana 1998, pet. denied) (citing Kline
v. O'Quinn, 874 S.W.2d 776, 782 (Tex. App.-Houston [14th Dist.] 1994, writ denied)).

 There is indisputably "a strong policy preference for enforcing arbitration clauses." Capital
Income Properties-LXXX v. Blackmon; 843 S.W.2d 22, 23 (Tex. 1992). In Blackmon, the Texas
Supreme Court granted arbitration of a set of investor tort claims against their limited partnership
for actions of the partnership in its operation, including fraud, breach of fiduciary duty, negligent
misrepresentation, and deceptive trade practices, because those tort claims "ar[ose] out of or in
connection with or relating to" the limited partnership agreement and thus fell within the scope of
the arbitration clause. Id. Note the apparent absence of any other relationship-and, of course, the
absence of a dispute or cause of action arising out of that different relationship-between the parties
outside of the agreement containing the arbitration clause.

 In a case decided by this Court applying the Fridl test, identical arbitration provisions in two
physicians' employment contracts with a professional association-to arbitrate disputes "arising over
the terms and conditions of this Agreement or in any manner relating to this Agreement"-were held
to require arbitration of related tort claims (the professional association's alleged defamation of the
physicians relative to their practice and its interference with the physicians' patient relationships)
since it could not be said with positive assurance that those claims were not covered by the
arbitration provision. Mallick, 978 S.W.2d 209. In Mallick, the employment agreements established
and governed the sole relevant relationship of the doctors with the professional association, so the
claims which touched on the relationship between employer and employee necessarily related to the
employment agreement.

 Valero Energy Corp. v. Teco Pipeline Co., 2 S.W.3d 576 (Tex. App.-Houston [14th Dist.]
1999, no pet.), involved a natural gas pipeline operating agreement which called for arbitration of
any dispute on "any matter within the scope of the Operating Agreement." Id. at 581. In the face
of claims for breach of fiduciary duty, fraud, tortious interference, and professional malpractice, and
an assertion that there was a separate, undocumented partnership between the parties out of which
the dispute arose, the Fourteenth Court of Appeals held that, since there was no evidence of any
relationship between the parties outside the joint venture contemplated by the operating agreement,
arbitration was required.

 On the other hand, Perlstein v. D. Steller 3, Ltd., 109 S.W.3d 36 (Tex. App.-Corpus Christi
2003,  pet.  filed),  involved  three  agreements,  (1)  a  letter  of  intent  to  purchase,  which  resulted
in (2) a purchase agreement, and (3) a post-purchase limited partnership agreement. The limited
partnership agreement called for arbitration of any dispute "directly or indirectly concerning this
Agreement or the breach hereof or the subject matter hereof." Id. at 38. The dispute was about
whether one party fraudulently induced the other to enter into the purchase agreement. Rejecting the
argument that the agreements were merged, the court of appeals denied arbitration, holding the
dispute outside the scope of the arbitration clause.

 In cases ordering arbitration of tort claims, the claims either related directly to the agreement
itself (5) or arose from the legal relationship governed by the agreement containing the arbitration
clause. (6) Here, Loy's employment agreement governed his role as an employee, C.F.O. of HomeUSA,
and did not touch his role as a director of the corporation. Couched in terms of the Fridl test,
Fleetwood's claim that, by selling his vote as a director, Loy breached his fiduciary duty, (1) can
stand alone, (2) is a tort completely independent of the employment relationship that then existed
between Loy and HomeUSA, and (3) could be maintained without reference to the employment
agreement. See Mediterranean Enters., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir.
1983) ("arising hereunder" covers disputes relating to the interpretation and performance of the
contract itself, not unrelated torts).

 For that reason, notwithstanding the policy and presumptions strongly favoring arbitration,
we conclude with positive assurance that Fleetwood's tort claim against Loy for breach of fiduciary
duty as a director was not covered by the arbitration provision in Loy's employment agreement. 
Therefore, the trial court was correct in denying arbitration. We affirm the partial summary
judgment denying arbitration.

 B. Res Judicata

 Loy also contends that, since Fleetwood did not prosecute its tort claim against Loy in the
prior arbitration of Loy's severance claim against Fleetwood, Fleetwood's claim is now barred by res
judicata. We disagree.

 Res judicata precludes the relitigation of claims that have been finally adjudicated in a prior
action, as well as claims that pertain to the same subject matter and could have been, but were not,
litigated. Amstadt v. United States Brass Corp., 919 S.W.2d 644, 652 (Tex. 1996); Freeman v.
Cherokee Water Co., 11 S.W.3d 480, 483 (Tex. App.-Texarkana 2000, pet. denied). In Barr v.
Resolution Trust Corp., 837 S.W.2d 627, 631 (Tex. 1992), the Texas Supreme Court held in
pertinent part: 

 The scope of res judicata is not limited to matters actually litigated; the judgment in
the first suit precludes a second action by the parties and their privies not only on
matters actually litigated, but also on causes of action or defenses which arise out of
the same subject matter and which might have been litigated in the first suit.


Id. at 630 (emphasis added) (citing Tex. Water Rights Comm'n v. Crow Iron Works, 582 S.W.2d 768,
771-72 (Tex. 1979)). Further, the court held that a determination of what constitutes the same
subject matter requires a factual analysis of the previous lawsuit, and any cause of action which
arises out of the same set of facts should have been litigated. Id.

 In Loy's employment contract, there were two severance clauses. One dealt with ordinary
termination of his employment, the other with termination resulting from any change in control of
the company. Under the latter clause, if Loy was relieved of duties after a change in ownership, he
would be entitled to considerably more than if the company merely chose to end his employment. 
In the arbitration over the effect of Loy's contract, the issue was the amount of severance he was due. 
The controlling question was whether Loy had effectively waived the "change of control" clause of
his employment contract and was due only the lesser amount under the straight termination clause. 
The arbitration panel decided Loy was due only the lesser termination amount because he had
effectively waived the change of control clause. (7)

 Fleetwood's current claim is breach of fiduciary duty by Loy in casting his vote as a director
in exchange for personal gain. The subject matter of the prior arbitration is not the same as that of
the current claim. Therefore, the current claim is not barred by res judicata. We overrule Loy's
contention.

II. Fleetwood's Appeal

 Fleetwood contends the trial court erred by ordering it to reimburse Harter for attorney's fees
he incurred defending against Loy's claims. Harter sought indemnity of defense expenses under an
explicit indemnity agreement he had with HomeUSA, as well as under HomeUSA's bylaws and
Texas' common law. The trial court concluded that Harter had not agreed to compensate Loy for
signing the waiver, that Harter acted on behalf of HomeUSA, and that this lawsuit by Loy was
against Harter in his capacity as a director. Therefore, HomeUSA/Fleetwood was required to pay
Harter's defense expenses.

 The indemnity agreement between Harter and HomeUSA provides, among other things, that
the company "shall indemnify" Harter for those expenses if he is sued "by reason of the fact that the
Indemnitee is or was a director, officer, employee or agent of the Company" so long as Harter "acted
in good faith and in a manner [Harter] reasonably believed to be in or not opposed to the best
interests of the Company . . . ." The trial court ruled that Fleetwood must indemnify Harter. (8)

 Fleetwood asks this Court to find that the trial court should have made the indemnification
ruling based solely on the allegations of Loy's petition and that it erred by looking to all the
proceedings to decide that issue. Fleetwood argues we should determine whether Loy, in his suit,
sought to recover for any wrongful act taken by Harter in his capacity as a director. Alternatively,
Fleetwood argues we should at least "place primary emphasis" on Loy's complaint.

 This concept was addressed by the Houston Fourteenth Court of Appeals in Grove v. Daniel
Valve Co., 874 S.W.2d 150, 153, 155 (Tex. App.-Houston [14th Dist.] 1994, writ denied). After
reviewing several cases applying Delaware law, the Houston court agreed that, although the
complaint provided a starting point for determining whether a director was entitled to indemnity, it
clearly should not be the only thing considered. The question is whether the necessary connection
between the corporate status and the allegations has been shown. (9)

 In this case, Loy alleged that Harter, to get the merger of HomeUSA into Fleetwood
approved, had promised Loy that Harter and Notre Capital would make Loy whole for what he would
lose by signing the waiver, including shares in Harter's next three IPO deals. The evidence shows 
HomeUSA's attorney was present during the "hallway" discussion. The evidence shows that the
stockholders of HomeUSA would have lost substantial sums if the merger had not been approved,
which would have happened if the waiver had not been signed. There is evidence that Harter did not
make such a deal, but that he was attempting to convince Loy to waive the clause for the good of
HomeUSA/Fleetwood.

 Under this state of the record, there is sufficient evidence to support the trial court's findings. 
We, therefore, cannot conclude the trial court erred by finding that the lawsuit against Harter was
taken in connection with his position as director of the company.

 Fleetwood attacks the trial court's finding that Harter did not promise Loy what Loy alleged,
arguing that such finding is without support in the evidence. Findings of fact entered in a case tried
to the court are of the same force and dignity as a jury's answers to jury questions. Anderson v. City
of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable
for legal and factual sufficiency of the evidence to support them by the same standards that are
applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a
jury question. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d
295, 297 (Tex. 1994).

 Fleetwood simply argues the trial court's finding is wrong, and there is evidence that a secret
arrangement of some kind existed about which it had not been informed. Based on that premise,
Fleetwood then argues that the secret agreement was necessarily between Harter and Loy, thus
neither HomeUSA nor Fleetwood was involved, and therefore, Fleetwood should not be liable under
the indemnity clause of the contract.

 In determining whether there is no evidence of probative force to support a jury's finding, we
are to consider only the evidence and inferences that tend to support the finding and disregard all
evidence and inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont'l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996). Anything more than a scintilla of
evidence is legally sufficient to support the finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996). 

 When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must
consider and weigh all of the evidence, not just that evidence which supports the verdict. Mari.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998). A court of appeals can set aside the
verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly
wrong and unjust. Id.; Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 Under both standards, there is evidence, which was obviously fully believed by the trial court,
that supports its findings. Fleetwood has not effectively attacked those findings. Accordingly,
Fleetwood's arguments that are based on acts involving any "agreement" by Harter to give Loy shares
in a later Harter/Notre Venture Capital IPO are irrelevant, because there are findings supported by
the evidence that no such agreement existed.

 Fleetwood's claim that Harter breached his fiduciary duties also fails, because the court
concluded the agreement did not exist. Further, even had the trial court concluded otherwise, it is
apparent from all versions of the evidence that HomeUSA's corporate counsel was in the hallway
when the conversation occurred; thus, the company was at least aware through its counsel of
whatever had happened between Loy and Harter.

 Fleetwood's main remaining contention is that, for various reasons, this litigation cannot
involve Harter in his status as a director of HomeUSA, and thus the indemnity clause does not apply,
and it should not have to pay his attorney's fees for defending the action.

 As quoted above, the indemnity provision serves to broadly protect a director who is acting
on behalf of the company. The basic claim raised by Loy against Harter was that he acted to induce
Loy to waive a contract clause and that Harter promised to give Loy some form of compensation for
so doing. The evidence shows that Harter had conversations with Loy, in the hallway, but the
version believed by the fact-finder was that the conversations did not result in action damaging in
any respect to HomeUSA.

 The lawsuit, however, is clearly connected with activities that occurred while the sale was
being negotiated. Even though the alleged (but not found to exist) agreement would have been
between Harter (or his companies) and Loy, and even though Harter (and Loy) obviously reaped a
substantial personal gain when the sale went through because of the premium sales price of the stock,
the trial court found that Harter did not act outside the parameters of a director and that his actions
were taken in his effort to cause the merger for the good of the stockholders as a whole.

 Under those facts, we cannot conclude the trial court erred by reaching the conclusion that
the lawsuit was brought by Loy against Harter for actions taken as a director on behalf of HomeUSA. 
Because we so hold, we need not address the arguments based on HomeUSA's bylaws or Texas'
common law. We affirm the portion of the judgment directing Fleetwood to indemnify Harter. (10)

 We affirm the judgment of the trial court in all respects.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: August 28, 2003

Date Decided: October 8, 2003

1. Harter, a principal of Notre Capital Ventures, II, L.L.C., and Notre Capital Ventures, III,
L.L.C., had solicited a tender offer by Fleetwood for the business and was attempting to bring about
the merger.
2. The record shows Loy had an employment contract with HomeUSA Management Co., L.P.,
providing the terms under which he would serve as C.F.O. for HomeUSA. Loy's employment
contract provided him with a substantial guarantee of continued employment or a large monetary
award in the event of a change in control of the company that resulted in his unemployment. Thus,
Loy was in a position to keep Fleetwood from consummating the purchase of HomeUSA, and Loy
was not willing to give up his guarantees and lucrative income without something more to show for
it. There is evidence he thought the merger proposal was good for HomeUSA, but not for him
personally.
3. In its findings, the court found that Loy was not a believable witness, that Harter did not
agree to compensate him in return for waiver of the employment contract provision-the opposite
conclusion from the one reached in the earlier partial summary judgment in Fleetwood's suit against
Loy-and that everything Harter did was for the benefit of the business or its stockholders. Based on
those factual conclusions, the trial court found Harter engaged in no conspiracy, manipulation of the
business, or breach of fiduciary duty.
4. In this case, Fleetwood sought reimbursement for the tort allegedly committed by Loy in a
breach of his fiduciary duty to the company. The trial court denied Loy's motion asking that
Fleetwood's lawsuit be arbitrated.
5. See In re J.D. Edwards World Solutions Co., 87 S.W.3d 546 (Tex. 2002) (claim of
fraudulent inducement of agreement "involv[es]" agreement, thus arbitration ordered).
6. This pattern seems to be true of cases from other jurisdictions, as well.


 In a 2001 federal case, Long v. Silver, 248 F.3d 309 (4th Cir. 2001), plaintiff shareholder sued
defendants, other shareholders, a corporation, and accountants, alleging claims arising from his
shareholder and employment relationship with defendant corporation. Plaintiff alleged that
defendants wrongfully diverted funds of defendant corporation and failed to distribute profits of
defendant corporation proportionately. Plaintiff further asserted that such conduct affected plaintiff's
rights under agreements with the predecessor to defendant corporation and defendant shareholders. 
The arbitration clauses in question required arbitration of "any and all disputes . . . arising out of or
in connection with this Agreement, or with respect to the construction and interpretation thereof, or
concerning the rights of any one or more parties hereto against any one or more parties hereto, or the
respective obligations of each party hereto to each other party hereto." Plaintiff, nonetheless, argued
that his claims were not within the ambit of the clauses. The court held that, since arbitration was
required for disputes arising out of or relating to the agreements, such broad language required
arbitration of plaintiff's claims as having a significant relationship to the agreements. Plaintiff's
claims were clearly referable to the agreements, which created plaintiff's shareholder and employee
status, and resolution of the disputes would depend on the terms of the agreements and the
construction of such terms. Id.


 In Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss & Saloga, P.C., 613 N.E.2d 331 (Ill.
App. 1993), a law firm sued its former employee (an attorney) for breach of fiduciary duty in
soliciting firm's former employee and clients during his employment with the firm. The firm sought
to enforce the generic arbitration clause from the employment agreement and was successful. It was
held that the generic arbitration clause in the employment contract ("[a]ny controversy or claim
arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration")
was broad enough to encompass the determination of whether the former employee breached his
fiduciary duty.
7. Under the termination clause, if terminated without cause, Loy was entitled to (1) his base
salary for whatever time was left in his three year contract or (2) one year's salary, whichever was
greater. The arbitration panel awarded him damages under that clause.
8. The trial court did not specify which "law" it was applying. In an abundance of caution,
Harter has analyzed the law of Delaware, Washington, and Texas, although the indemnity agreement
itself specifies it is based on Delaware general corporation law. HomeUSA's bylaws state the law
of the State of Washington governs them.
9. In that case, the court reviewed the Delaware statute, rather than the language of this
indemnity contract. The statute provided for indemnity if (1) the status was proven, and (2) the
corporate person wins.
10. A portion of the judgment orders Fleetwood to pay any future judgment rendered against
Harter "arising from or in connection with the claims, actions and causes of action asserted by
plaintiff, Michael Loy, against defendant, Steven Harter, in this case." That conclusion is extremely
broad. Because there is presently no judgment against Harter, we cannot know what, if any,
judgment against him might ultimately be rendered, or on what it might be based. That language is
not so wide-ranging as Fleetwood suggests, however. It provides specifically that the award is
limited solely to the causes of action asserted in this case-as opposed to causes of action that might
be asserted between these same parties at some other point.


'mso-spacerun:yes'>                                                                                                   

 

 

                                      On Appeal from the 102nd
Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 09F0483-102

 

                                                                
                                  

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                    Opinion by Chief Justice Morriss

                             Dissenting Opinion
by Justice Carter








                                                                   O P I N I O N

 

            Billy Dee
Riley, Jr., had been convicted of murder in a Bowie County jury trial.  The punishment phase evidence had been fully
received, during which the primary defense strategy had been to seek community
supervision for Riley.  In fact, Rileys
attorneys had advised him before and during trial that he was qualified to ask
for community supervision.  But, during
the charge conference on punishment, his defense team was surprised to discover
that Riley was not eligible for community supervision because he had opted to
try the case to the jury.  The jury
assessed punishment of fifty years imprisonment.  

            After
seeking and being denied a new trial, Riley appeals the trial courts judgment
sentencing him in accordance with the jurys verdict.  Riley complains of ineffective assistance of
counsel and other grounds.[1]  Because we agree with Riley that his counsels
advice regarding availability of community supervision by a jury constituted
ineffective assistance of counsel, we reverse and remand for a new trial based
on this dispositive issue alone.

            Any
allegation of ineffectiveness of counsel must be firmly founded in the record.  Goodspeed v. State, 187 S.W.3d 390, 392 (Tex.
Crim. App. 2005); Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); Wallace v.
State, 75 S.W.3d 576,
589 (Tex. App.Texarkana 2002), affd, 106 S.W.3d 103 (Tex. Crim. App. 2003).  Riley bears the burden of proving by a
preponderance of the evidence that his counsel was ineffective.  Goodspeed, 187 S.W.3d at 392; Thompson, 9 S.W.3d at 813; Cannon
v. State, 668 S.W.2d
401, 403 (Tex. Crim. App. 1984).

            We
apply the two-pronged Strickland test handed down by the
United States Supreme Court to the claim of ineffective assistance of counsel.  Hill v.
Lockhart, 474 U.S. 52, 57 (1985); see
Strickland v. Washington, 466 U.S. 668 (1984).  Failure to satisfy either prong of the Strickland test
is fatal.  Ex parte Martinez, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006).

            Because Rileys
challenge was made to the trial court in a motion for new trial, we analyze the
ineffective assistance claim as a challenge to the denial of his motion for new
trial.  Charles v. State, 146 S.W.3d 204, 20810 (Tex. Crim. App. 2004), superseded by rule on other grounds by State
v. Herndon, 215 S.W.3d 901 (Tex. Crim.
App. 2007); Shanklin v. State, 190
S.W.3d 154, 158 (Tex. App.Houston [1st Dist.] 2005), pet. dismd, 211 S.W.3d 315 (Tex. Crim. App. 2007) (reversing for
new trial on punishment due to counsels failure to investigate and present
mitigating evidence); State v. Kelley,
20 S.W.3d 147, 151 (Tex. App.Texarkana 2000, no pet.) (grant of motion for new
trial based on ineffective assistance was proper).  Therefore, we review the Strickland test through an abuse of discretion standard, and
reverse only if the trial courts decision is arbitrary or unreasonable,
viewing the evidence in the light most favorable to the ruling.  Shanklin,
190 S.W.3d at 15859.  A trial court
abuses its discretion in denying a motion for new trial only when no reasonable
view of the record could support the trial courts ruling.  Charles,
146 S.W.3d at 208.

            First,
Riley must show that counsels performance fell below an objective standard of
reasonableness in light of prevailing professional norms.  Strickland, 466 U.S. at 68788. 
There is a strong presumption that counsels conduct fell within the wide range
of reasonable professional assistance and that the challenged action could be
considered sound trial strategy.  Id. at 689; Ex
parte White, 160
S.W.3d 46, 51 (Tex. Crim. App. 2004); Tong v. State, 25 S.W.3d 707, 712 (Tex. Crim.
App. 2000).  Therefore, we will not
second-guess the strategy of Rileys counsel at trial through hindsight.  Blott
v. State, 588 S.W.2d
588, 592 (Tex. Crim. App. 1979); Hall v. State, 161 S.W.3d 142, 152 (Tex.
App.Texarkana 2005, pet. refd).

            Rileys motion for new
trial asserted ineffective assistance of counsel and was supported by live
testimony and by two affidavits considered by the trial court.  The affidavit of Rileys lead counsel, Kyle
Davis, stated:

In addition to
me, Defendants defense team was comprised of attorneys Craig Barrett and Joe
Tyler.  Prior to trial, and during the
course of the trial, each of us advised Defendant that he would be eligible for
probation in the event he was convicted of murder.  During voir dire examination of the jury
panel, both the defense and the prosecuting attorney questioned the prospective
jury panel on their opinions of the applicability of probation for a person
convicted of murder.  During the
punishment phase of the trial, the defense called a probation officer to
testify concerning the terms and conditions Defendant would have to satisfy if
the jury recommended probation in the case. 
The probation officer never mentioned that Defendants murder conviction
would make him ineligible for probation. Moreover, neither the prosecuting
attorney nor the trial judge ever alluded to Defendants ineligibility for
probation during the direct examination and the cross-examination of the
probation officer.  . . . The first time
it was ever mentioned that Defendants murder conviction would make him
ineligible for probation was during the punishment phase charge conference.

 

 

Rileys affidavit stated:

 

Other than the
underlying felony conviction of murder in the above-entitled and numbered
cause, I have never before been convicted of a felony in any federal or state
court in this or any other state.  . . . Prior
to trial, and during the course of the trial, each of my attorneys advised me
that I would be eligible for probation in the event I was convicted of murder.  . . . Had my trial attorneys not given me
erroneous advice concerning my eligibility for probation in the event I was
convicted of murder, I would have entered an open plea of nolo contendere to
the trial court in hopes that the trial court would grant deferred adjudication
probation pursuant to Section 5 of Article 42.12 of the Texas Code of Criminal
Procedure.

 

            At the hearing on the
motion for new trial, Tyler testified that he advised Riley that he would be
eligible for community supervision if convicted of murder, that he first became
aware of the mistake after the punishment evidence had been put on but before
closing arguments in the punishment phase, and that the whole punishment
phase of the trial, the defense evidence put on was basically arguing for
probation.  Even the prosecutor
testified he was not aware that Riley could not receive community supervision
from the jury. 

            After considering the
affidavits of Riley and his counsel and the hearing testimony, the trial court
overruled the motion for new trial. 
Based on this record, we consider Rileys claim of ineffective
assistance.

            It is undisputed that
counsels belief that Riley could receive community supervision in the event of
a murder conviction was erroneous. 
Sections 3g and 4(d)(8) of Article 42.12 prevent a judge or jury from
ordering or recommending community supervision following a conviction of
murder.  Tex. Code Crim. Proc. Ann. art. 42.12, §§ 3g, 4(d)(8) (West
Supp. 2010).  On the other hand, Section
5 of Article 42.12 allows a judge to enter deferred adjudication community
supervision after receiving a plea of guilty or nolo contendere to a charge of
murder.  Tex. Code Crim. Proc. Ann. art. 42.12, § 5(a) (West Supp.
2010); see Cabezas v. State, 848
S.W.2d 693, 695 (Tex. Crim. App. 1993). 
Counsels misunderstanding on this critical point is documented in the application
for community supervision from the jury and the fact that each of five
punishment witnesses testified on subjects relating to community
supervision.  

            Counsel has a duty to
exert best efforts to ensure that the clients decisions are based on correct
information as to the applicable law.  Ex parte Wilson, 724 S.W.2d 72, 74 (Tex. Crim.
App. 1987).  An attorneys failure to
give competent advice to a defendant which would promote an understanding of
the law in relation to the facts and which would permit an informed and
conscious choice is error.  Gallegos v. State, 756 S.W.2d 45, 48 (Tex.
App.San Antonio 1988, pet. refd) (after denial of motion for new trial,
sister court found counsel ineffective for failing to inform defendant, charged
with Article 42.12, Section 3g offense, that his waiver of assessment of
punishment by jury would foreclose possible community supervision) (citing Ex
parte Morse, 591
S.W.2d 904, 905 (Tex. Crim. App. 1980)).

            In assessing
competence, we [hold] counsel accountable for knowledge, or the ability to
attain knowledge, of relevant legal matters which are neither novel nor
unsettled.  Ex parte Moody, 991 S.W.2d 856, 858 (Tex. Crim. App. 1999).  Whether Riley was eligible for community
supervision from the jury was a settled matter of law that was readily
ascertainable.  During the hearing on the
motion for new trial, although the State asked whether Riley went to trial
based on the trial strategy of using self-defense, counsel did not testify that
his failure to inform Riley he was ineligible for deferred adjudication was due
to any trial strategy.[2]  Because there is no evidence suggesting that
counsels failure to inform Riley on this settled matter of law could be
considered reasonable trial strategy, the only ruling which could have been
made in light of the evidence presented was that counsels performance fell
below an objective standard of reasonableness in light of prevailing professional
norms.  We conclude that the first Strickland prong has been met.

            The
second Strickland prong, prejudice, requires a showing that, but
for counsels unprofessional error, there is a reasonable probability that the
result of the proceeding would have been different.  Strickland, 466 U.S. at 68788.  Reasonable probability means a probability
sufficient to undermine confidence in the outcome.  Id.
at 694.  Stricklands second prong carries a lower burden of proof than the
preponderance of the evidence.  See Bouchillon
v. Collins, 907 F.2d 589, 595 (5th Cir. 1990); Strickland, 466 U.S. at 694.  An appellant need not show that counsels
deficient performance more likely than not altered the outcome of the case.  Milburn
v. State, 15 S.W.3d 267, 269 (Tex. App.Houston [14th Dist.] 2000, pet. refd).


            In State v. Recer, 815 S.W.2d 730 (Tex.
Crim. App. 1991), the Texas Court of Criminal Appeals held that 

[t]o
support a claim for ineffective assistance of counsel where, as in this case,
the complaint is that counsel misunderstood the law regarding [community
supervision] . . . . [t]here must be evidence that the defendant was initially
eligible to receive [community supervision], that counsels advice to go to the
[jury][3]
for sentencing was given as a part of a valid trial strategy, that  the defendants decision to have the [jury]
assess punishment was based on his attorneys erroneous advice, and that the
defendants decision would have been different if [his] attorney had correctly
informed [him] of the law.

 

Id. at 73132.

 

            We
have already established that counsel misunderstood the law regarding deferred
adjudication community supervision and that his advice to Riley could not have
been based on a valid trial strategy, given the evidence before the trial
court.  Also, in this case, it is
undisputed that Riley was initially eligible to be considered for deferred
adjudication community supervision from the trial court.[4]  Rileys affidavit, and the affidavit of his
counsel read into the record at the hearingboth of which the trial court
considered as evidencestated that, absent counsels erroneous advice, Riley
would have pled nolo contendere and would have asked the trial court for
deferred adjudication community supervision. 
The evidence of Rileys plea had he received the proper advice was not
disputed by the State.  

            Therefore,
the evidence has conclusively shown that: 
(1) Riley could have been eligible to be considered for community
supervision; (2) counsels advice to use the jury for sentencing was not part
of a valid trial strategy; (3) Rileys decision to use the jury for punishment
was based on counsels erroneous advice; and (4) Rileys decision would have
been different if counsel had correctly informed him of the law regarding
community supervision.  Recer, 815 S.W.2d at 731; Garcia v. State, 308 S.W.3d 62 (Tex.
App.San Antonio 2009, no pet.); Isham,
258 S.W.3d at 252.

            Riley also
argues that, under Hill, his plea was
involuntary.  [T]he voluntariness of the
plea depends on (1) whether counsels advice was within the range of competence
demanded of attorneys in criminal cases and if not, (2) whether there is a
reasonable probability that, but for counsels errors, he would not have
pleaded guilty and would have insisted on going to trial.  Moody,
991 S.W.2d at 85758 (citing generally Hill,
474 U.S. 52; Strickland, 466 U.S. 668;
McMann v. Richardson, 397 U.S. 759 (1970);
Ex parte Morrow, 952 S.W.2d 530, 536
(Tex. Crim. App. 1997)).  These cases
present opposite factual scenarios in which the defendant has pled guilty.  They are predicated on the theory that the
defendant has given up a valuable rightthe right to a jury trial.

            Here, Riley
cannot argue that he gave up the valuable right to a jury trial; however,
counsels action did foreclose the possibility of deferred adjudication
community supervision.  The right to
[community supervision] is valuable.  Thompson v. State, 604 S.W.2d 180, 182
(Tex. Crim. App. [Panel Op.] 1982) (citing
Trevino v. State, 577 S.W.2d 242, 243
(Tex. Crim. App. 1979)).  Again, while
the following cases present a reverse scenario in which the defendants pled
guilty based on erroneous advice from counsel that they could receive community
supervision from the trial court, we have found the Strickland second prong met where counsels advice foreclosed any
opportunity for community supervision.  See Hart v. State, 314 S.W.3d 37, 4445
(Tex. App.Texarkana 2010, no pet.) (citing Ex
parte Battle, 817 S.W.2d 81, 83 (Tex. Crim. App. 1991)); Cardenas v. State, 960 S.W.2d 941,
94647 (Tex. App.Texarkana 1998, pet. refd); see also Garcia, 308 S.W.3d at 73.

            Here, the
defense teams misunderstanding of the law foreclosed Rileys possibility of
receiving deferred adjudication.  Because
the statute allowed a trial court to impose deferred adjudication community
supervision for murdera possibility deemed reasonable by the Legislatureand
counsels advice foreclosed this option, which the trial court otherwise would
have been required to consider, we find, and the uncontested evidence at the
motion for new trial demonstrated, there was a reasonable probability that the
result of the proceeding would have been different absent the erroneous
advice.  A finding to the contrary would
require us to speculate, without support in the record, regarding whether the
trial court would have awarded deferred adjudication community supervision if
given the option.[5]  That speculation would necessarily have us
considering evidence about the actual process of decision . . . not part of
the record of the proceeding under review, and evidence about, for example, a
particular judges sentencing practicesan exercise forbidden to us.  See
Strickland, 466 U.S. at 695.  

            Because
Riley[6]
has met both prongs of the Strickland test,
we sustain his first issue on appeal.[7]  Accordingly, the trial courts judgment is
reversed, and this case is remanded to the trial court for a new trial.

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

 

 

DISSENTING OPINION

 

            When Billy Dee Riley, Jr., was asked
if he killed Terry Matthews, he answered, Evidence says that.   Q.  Did the bullet that killed Terry
Matthews come from your gun?  A.  Thats what the evidence proved.  Q.  So
you have no dispute with that?  A.  Its science. 


            These events
took place at a local night club where a fight began.  The security guard attempted to control the
altercation by spraying mace or pepper spray, but it apparently had the
opposite effect.  People ran out of the
club, but Riley went to the console of his truck, obtained his gun, put it in
his pocket, and went back inside the club building.  Riley became engaged in a fight and testified,
I pulled the gun out of my back pocket. 
The gun . . . went off two times because the safety got jammed.  Riley heard shots and began shooting over his
shoulder.  And I could see flashes of
the guns, and I was shooting and I shot until my gun was clear.  The deceased, Matthews, was unarmed.  Another witness testified, Mr. Riley was out
of his car and just shooting, randomly shooting.  The forensic pathologist testified that the
distance between the gun and the body was one to four feet.   

            These are
the facts that Riley now says he would have liked to have presented to the
trial judge and pled guilty and then ask the judge to defer his murder conviction
and place him on community supervision. 
Upon successfully completing the terms of community supervision, Riley
would then have no record of a conviction for this offense.  

            No
doubt the attorneys were deficient in advising Riley that he could ask the jury
for community supervision.[8]  The real question before us is whether there
is a reasonable probability that but for that deficient advice, the result
would have been different.  This issue
has never been presented to an appellate court so far as counsel and this Court
can determine after intense research.  
The majority opinion quotes State
v. Recer for the requisite proof in this situation.   815 S.W.2d 730, 73132 (Tex. Crim App. 1991).
 In Recer,
the Texas Court of Criminal Appeals found no deficient conduct by the attorney
when he advised a defendant that the trial court could assess probation
(community supervision) even though a jury had found the defendant used a
deadly weapon which precluded such consideration.  The facts of that case did not prove the
attorneys advice was not based on a valid strategy.  So the Texas Court of Criminal Appeals held
that the attorneys conduct fell within proper professional standards;
consequently, the dicta cited in the majority opinion is not controlling.[9]  

            We must
decide, without controlling precedent, whether these facts lead to the
conclusion that it is reasonably probable that if counsel had advised Riley he
could plead guilty and ask the judge to defer his guilt and place him on
community supervision, a different result would have occurred.  I do not think so.

            I
agree we cannot try to analyze the particular sentencing practices of a judge,
but we have the entire record before us and we are to consider what is
reasonably probable.  This case was hotly
contested with Riley urging self-defense, reduction of the charge by a finding
of sudden passion, and lesser included offenses.   In order for Riley to attempt to obtain a
deferred adjudication, he would have to plead guilty and waive all the possible
defenses, as well as relieve the State of its burden to prove this murder
beyond a reasonable doubt.  Had that
course of action been taken, Riley would go before the trial judge, after
admitting he committed murder, to ask for deferral of the sentence.  The trial judge had an opportunity to
consider the merits of this allegation at the motion for new trial hearing, but
denied the motion.  We are to review that
decision on an abuse of discretion standard. 


            It is Rileys
burden to prove that it is reasonably probable there would have been a
different result had counsel provided accurate advice.  The majority opinion details the deficient
conduct, but does not explain how Riley proved that, but for such deficient
conduct, a different result was reasonably probable.  Instead, the opinion, in a conclusory
fashion, states that Riley has met both prongs of the Strickland[10]
test.  I do not believe the trial court
abused its discretion in denying the motion for new trial.  

            I respectfully dissent.    

            

            

                                                                                    Jack
Carter                              

                                                                                    Justice

 

Date
Submitted:          June 15, 2011

Date
Decided:             July 29, 2011

 

Publish

 

 











[1]In
addition to the dispositive ground addressed in this appeal, Riley argued that:  (1) the trial court had a duty to admonish
him regarding ineligibility of community supervision from a jury; (2) the court
failed to include language in the punishment charge requiring rejection of the
issue of sudden passion to be unanimous; (3) the punishment charge allowed
rendition of a nonunanimous verdict; (4) counsel rendered ineffective
assistance in failing to object to the punishment charge; (5) evidence was
insufficient to establish the jurys rejection of sudden passion during
punishment; and (6) the trial court erred by excluding certain photographs and
testimony.  





[2]The
State argues that the defense teams strategy was to argue and present evidence
of self-defense.  This reasoning might
have been persuasive if a record in this was not developed demonstrating
counsels reasoning.  In this case, it is
undisputed, however, that this strategy was developed through counsels
misunderstanding of the law.  Rileys
affidavit stated that, had he known he would not be eligible to receive
community supervision from the jury, he would have asked the trial court for
deferred adjudication community supervision. 
The decision on how to plead is ultimately the sole province of the
defendant.  The State also argues,  When asked whether or not entering an open
plea to the trial court for murder based on this set of facts would have been a
viable trial strategy from him, Rileys trial counsel replied, [t]he
likelihood of that would be small. 
However, the question is not what counsels advice would be when faced
with Rileys uncontested affidavit that his plea would have been different, but
rather, whether counsels failure to advise Riley that he was ineligible for
community supervision if found guilty by a jury was due to any reasonable trial
strategy.  Next, the State points to the
inclusion of lesser included offenses for the proposition that counsels
failure to inform his client that he would not be eligible for community
supervision by a jury was due to some trial strategy.  This theory was not presented to the trial
court during the hearing on the motion for new trial; thus, counsel did not
testify that the inclusion of lesser included offenses was a part of a trial
strategy justifying failure to inform Riley that he would be ineligible for
community supervision by a jury.  See generally Ramirez v. State, 301
S.W.3d 410 (Tex. App.Austin 2009, no pet.) (rejecting States argument that
counsels mistake to have trial court assess punishment following conviction of
Article 42.12, Section 3g offense was based on trial strategy where record
revealed otherwise).





[3]Although
Recer was decided in a different
posture, in which counsels advice led to punishment assessment by the trial
court, we find the test in Recer instructive.


 





[4]The
State concedes Rileys initial eligibility. 
We believe the Court of Criminal Appeals included the word initially to require that the defendants
eligibility be determined as of the filing of the punishment election rather
than at the time of the punishment hearing.  Isham v.
State, 258 S.W.3d 244, 253 (Tex. App.Eastland 2008, pet. refd) (referring
to Recer, 815 S.W.2d 730).  Rileys punishment election was made several
months before trial.  





[5]The
State cites the following statement made by the trial court as support for the
proposition that the result of the proceeding would not have been different
absent counsels error:  

It
justfrom the motion itself, the issue is oneits just a legal motion, not
hypothetically what the Court would have done or would not have done.  The record speaks for itself in that this
case went to the jury and the jury has addressed the issue.  I feel that I probablyreally, I probably can
not [sic] state what my opinion is in it, other than the jury verdict speaks
for itself, and this Court accepted the jury verdict in this matter and ruled
and assessed the punishment as stated by this jury.

 

We do not consider this a statement by the
trial court that it would necessarily have denied deferred adjudication
community supervision had Riley entered an open plea of nolo contendere.

 





[6]We
limit our holding to the unique facts of this case.

 





[7]A
few days before its brief was due (and well after the clerks record was
received by this Court), the State attempted to supplement the record with a
new affidavit created by the prosecuting attorney averring, among other things,
that he would not have approved the waiver of the right of trial by
jury.  The Texas Rules of Appellate
Procedure provide that the record may be supplemented only [i]f a relevant
item has been omitted from the clerks record. 
Tex. R. App. P.
34.5(c)(1); Amador v. State, 221
S.W.3d 666, 67677 (Tex. Crim. App. 2007). 
It is clear that the States newly created affidavit was not before the
trial court when it ruled on the motion for new trial.  We struck the States affidavit as an
improper attempt to avoid Rule 34s purpose to ensure[] that the record on
appeal accurately reflects all of the evidence that was seen by, used by, or
considered by the trial judge at the time he made a ruling.  Amador,
221 S.W.3d at 677.  The States affidavit
will not be considered by this Court.





[8]Experience
is a great teacher, but this case points out why lawyers cannot rely on that
alone.  Prior law allowed a request for
probation (community supervision) even in murder cases, and it seems in this
case everyone was operating under that perception.  The law changed in 2007.  Act of April 25, 2007, 80th Leg., R.S., ch.
1205, § 3(5), 2007 Tex. Gen. Laws 4078, 4079.   


 





[9]In
Recer the defendant waived his right
to have the jury assess punishment whereas here the defendant insisted on that
right.  





[10]
Strickland v. Washington, 466
U.S. 668 (1984).